Carol STRAHLER, Appellant,

v.

ST. LUKE'S HOSPITAL, et al.,
Respondents.

No. 66789.

Supreme Court of Missouri,
En Banc.

Feb. 18, 1986.
Rehearing Denied March 25, 1986.

**8** 

Ronald R. Holliger, Ronald J. Stites, Kansas City, for appellant.

Larry L. McMullen, Robin V. Foster, Kansas City, for respondents.

BILLINGS, Judge.

This appeal challenges the constitutionality of Missouri's medical malpractice statute of limitations, § 516.105, RSMo 1978, as it applies to minors. We ordered the case transferred to this Court prior to opinion by the court of appeals because of the constitutional issue. Mo. Const. art. V, § 10. We reverse the dismissal of plaintiff's petition and remand the case for further proceedings.

On September 23, 1982, plaintiff Carol A. Strahler, then nineteen years old, filed a single count petition for damages in the Circuit Court of Jackson County. Plaintiff's petition alleged that when she was a fifteen year old minor, defendant Dr. Sandow and four other named defendants had provided her with careless and negligent medical treatment and that as a direct and proximate result of defendants' negligence, she suffered the complete amputation of her right leg above the knee.

Defendants moved to dismiss the action on the ground that plaintiff's common law cause of action was barred by § 516.105, RSMo 1978, because a suit of this kind must be brought within two years from the date of the complained of actionable wrong and plaintiff did not bring suit until four years after the alleged malpractice. Plaintiff appeals from the trial court's order dismissing her medical malpractice action against defendant Dr. Sandow.[1]

Section 516.105 is as follows: **Actions against health care providers (medical malpractice.)**—All actions against physicians, hospitals, dentists, registered or licensed practical nurses, optometrists, podiatrists, pharmacists, chiropractors, professional physical therapists, and any other entity providing health care services and all employees of any of the foregoing acting in the course and scope of their employment, for damages for malpractice, negligence, error or mistake related to health care shall be brought within two years from the date of occurrence of the act of neglect complained of, except that a minor[2] under the full age of ten years shall have until his twelfth birthday to bring action, and except that in cases in which the act of neglect complained of its introducing and negligently permitting any foreign object to remain within the body of a living person, the action shall be brought within two years from the date of the discovery of such alleged negligence, or from the date on which the patient in the exercise of ordinary care should have discovered such alleged negligence, whichever date first occurs, but in no event shall any action for damages for malpractice, error, or mistake be commenced after the expiration of ten years from the date of the act of neglect complained of.

Although plaintiff has propounded a number of constitutional arguments,[3] the dispositive challenge that she raises to the constitutionality of § 516.105, RSMo 1978, is that it violates the mandate of Mo. Const. art. I, § 14, which guarantees to every Missouri citizen "that the courts of justice shall be open to every person, and

1. The four other defendants who were named in the petition have reached a settlement with plaintiff and are no longer parties to this action.

2. In Missouri a minor, or infant, in connection with the commencement of a civil action, is defined as any person who has not attained the age of eighteen years. Section 507.115, RSMo 1978. And, when a minor sustains injuries due to another's negligence, he acquires his own independent common law cause of action, separate and distinct from any his parents may acquire from the tortfeasor's negligent acts. *See*

*generally, Evans v. Farmers Elevator Co.,* 347 Mo. 326, 147 S.W.2d 593 (1941).

3. Plaintiff has also advanced state and federal equal protection and due process arguments as well as the theory that § 516.105, RSMo 1978, constitutes a special or local law in violation of article 3, § 40 of our state constitution. Our disposition of plaintiff's challenge to § 516.105, RSMo 1978, under Mo. Const., art. I, § 14 eliminates the necessity of reaching the merits of these other constitutional points.

certain remedy afforded for every injury to person...."

We begin our analysis by pointing out that although our federal Constitution is an important and frequently relied upon source of individual rights, our state Constitution is also a reservoir of personal rights and liberties—some of which are not enumerated in or accorded protection by our federal Constitution. Article I, section 14 is one such provision in our state Constitution which grants to the people of Missouri an express constitutional guarantee not enumerated in our federal Constitution. *But see Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982); *Boddie v. Connecticut*, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971).

In *State ex rel. Cardinal Glennon Memorial Hospital v. Gaertner*, 583 S.W.2d 107 (Mo. banc 1979), we found Missouri's statutorily mandated Professional Liability Review Board, §§ 538.010–.080, RSMo 1978, violative of Mo. Const. art. I, § 14 because it imposed an unduly burdensome precondition on a litigant's right of access to the courts. *State ex rel. Cardinal Glennon v. Gaertner*, 583 S.W.2d at 110. Our holding in *Cardinal Glennon* simply reaffirmed the principle that Mo. Const. art. I, § 14 is a part of this State's organic law and that it was intended to give constitutional protection to a litigant's ability to gain access to Missouri's courts. *See generally, DeMay v. Liberty Foundry Co.*, 327 Mo. 495, 37 S.W.2d 640 (1931); *see also State ex rel. National Refining Co., v. Seehorn*, 344 Mo. 547, 127 S.W.2d 418 (1939). The language contained in Mo. Const. art. I, § 14 is not simply advisory in nature: it gives express constitutional protection to a litigant's right of access to our court system.

Here, plaintiff contends that § 516.105, RSMo 1978—in violation of Mo. Const. art. I, § 14—unconstitutionally devitalizes and effectively extinguishes her common law right and practical opportunity to seek legal redress for injuries sustained through defendant's alleged negligent medical treatment. Defendant, however, argues that § 516.105, RSMo 1978, does not contravene Mo. Const. art. I, § 14 because plaintiff, who was fifteen years of age at the time of the alleged malpractice, could have recruited a next friend to bring suit and was thus able to institute an action in her own right under Missouri law.

In Missouri, a person who is under the legal disability of minority still lacks capacity to institute, in his own right, a civil lawsuit. *See Scott v. Royston*, 223 Mo. 568, 123 S.W. 454 (1909); *see e.g., Martin v. Martin*, 539 S.W.2d 756 (Mo.App.1976) (an award of child support is made to the custodial parent for the benefit of children who because of minority lack legal status to bring suit directly). Rule 52.02(a) requires that "civil actions by minors ... be commenced and prosecuted only by a duly appointed guardian ... or by a next friend appointed for him...." This legal principle is also codified in statutory form and is found at §§ 507.110–.120, RSMo 1978.

Defendant suggests that Rule 52.02(c) serves to relieve a minor who is at least fourteen years of age of the legal disability of minority. To the contrary, Rule 52.02(c) provides only that in the case of a minor who is fourteen or older, appointment of a next friend can be made without notice to the persons with whom the minor resides, and it can be accomplished without formal application to the court. The minor, however, must still have a next friend who agrees in writing to serve as such. This provision of Rule 52 simply does not imbue a minor who is at least fourteen years old with the legal capacity necessary to maintain a civil action in his own right.[4]

---

**4.** Defendant also cites Rule 52.02(m) and our decision in *Concerned Parents v. Caruthersville School District 18*, 548 S.W.2d 554 (Mo. banc 1977), as additional authority for the proposition that appellant was free to initiate her own law suit as a fifteen year old minor.

In *Concerned Parents*, we determined only that the minor plaintiffs' failure to comply with our rules governing appointment of a next friend proved to be harmless under Rule 52.-02(m) because it was shown that the minors' interests had been adequately protected. We

It should not escape notice that although the present case involves a fifteen year old minor, § 516.105, RSMo 1978, applies with equal force to all minors past the ripe old age of ten.[5] We think defendant's contention that plaintiff should not now be heard to complain because she was free to "initiate her own suit" plainly ignores the disabilities and limitations that childhood, familial relationships, and our legal system place upon a minor of tender years—who has little if any understanding of the complexities of our legal system.

The many value-laden issues to which this controversy gives rise were eloquently distilled and put into sharp relief by a commentator writing in a recent edition of the Journal of Legal Medicine:

> State legislatures reacted in the 1970's to a perceived crisis in medical malpractice insurance by enacting these types of limitations provisions. While such provisions no doubt go some distance in alleviating the problems of malpractice insurers and health care providers, they do so only at a high cost. *Their effect is to bar the malpractice suits of minors without regard to the validity of their claims or the fact that the minors are wholly innocent in failing to timely pursue their claims. Such a result seems to unfairly penalize the blameless minor in order to protect the po-tentially negligent health care provider.* (emphasis added).

Andrews, *Infant Tolling Statutes in Medical Malpractice Cases: State Constitutional Challenges*, 5 J. Legal Medicine, 469 (1984).

The fact of the matter is that for most minors the opportunity to pursue a common law cause of action for injuries sustained from medical malpractice is one that is inextricably linked to the diligence and willingness of their parents to act in a responsible and timely manner. When faced with a controversy involving very similar legal issues, the Texas Supreme Court concluded that "it is neither reasonable nor realistic to rely upon parents, who may themselves be minors, or who may be ignorant, lethargic, or lack concern, to bring a malpractice lawsuit action within the time provided...." *Sax v. Votteler*, 648 S.W.2d 661, 667 (Tex.1983). In this connection, we think it is equally unreasonable to expect a minor, whose parents fail to timely vindicate his legal rights, to independently seek out another adult willing to serve as a next friend. Such an expectation would ignore the realities of the family unit and the limitations of youth.

The *Sax* case involved a similarly restrictive, though not identical, medical malpractice limitations period[6] which ran against

---

note that the adult plaintiffs, though not formally appointed, were the natural guardians of the minor plaintiffs and were also real parties in interest. We also instructed the parties to comply with the rule upon remand. *Concerned Parents, supra*, at 558, n. 3. Rule 52.02(m) provides only that the failure to appoint a next friend will not render a proceeding invalid if it is determined that the interests of the minor were adequately protected. Application of this rule contemplates a minor gaining entry into the courtroom. In the present case, however, the rule would have no application because the minor was barred *from ever getting inside the courthouse doors.*

5. In this connection we note that under the operation of § 516.105, RSMo 1978, minors under the full age of ten have until two years after their tenth birthday to file an action of this kind. *See McLeran v. St. Luke's Hospital of Kansas City*, 687 S.W.2d 892, 893 (Mo. banc 1985).

6. The Texas statute read as follows:
 Notwithstanding any other law, no claim against a person or hospital covered by a policy of professional liability insurance covering a person licensed to practice medicine or podiatry or certified to administer anethesia in this state or a hospital licensed under the Texas Hospital Licensing Law, as amended (Art. 4437f, Vernon's Texas Civil Statutes), whether for breach of express or implied contract or tort, for compensation for a medical treatment or hospitalization may be commenced unless the action is filed within two years of the breach or the tort complained of or from the date the medical treatment that is the subject of the claim or the hospitalization for which the claim is made is completed, except that minors under the age of six years shall have until their eighth birthday in which to file or have filed on their behalf, such claim. Except as herein provided, this section applies to all persons regardless of minority or other legal disability.

minors, who under Texas law lacked the capacity to bring their own lawsuits.[7] The Texas Supreme Court held that the statute ran afoul of the state's constitutional due process clause and open courts provision. The court employed a test that balanced the litigant's right to redress and the extent to which this right had been burdened against the legislative purpose of the statute and the method employed by the legislature to reach the ends desired. After applying this test, the Texas Supreme Court held the statute to be an arbitrary and unreasonable exercise of legislative power as it pertains to minors because the statute "effectively abolishes a minor's right to bring a well-established common law cause of action without providing a reasonable alternative." *Sax v. Votteler*, 648 S.W.2d at 667.

Turning to the present case, we fully appreciate the legislative purpose intended by § 516.105, RSMo 1978, and we are unwilling to denominate it as being illegitimate, but we think the method employed by the legislature to battle any escalating economic and social costs connected with medical malpractice litigation exacts far too high a price from minor plaintiffs like Carol Strahler and all other minors similarly situated. For minor plaintiffs like Carol Strahler, the cure selected by the legislature would prove no less pernicious than the disease it was intended to remedy.

The requirement that "[c]ivil actions by minors may be commenced and prosecuted *only* by a duly appointed guardian of such minor ..." (emphasis added), acts as an impediment to a minor's access to the

courts. *See* Rule 52.02(a) and § 507.110. That right of access is "an aspect of the right to petition the government ... explicitly preserved in the constitution of Missouri." *State ex rel. Cardinal Glennon Memorial Hosp. v. Gaertner*, 583 S.W.2d at 110.

■ Recognizing that a minor lacks the legal capacity to bring an action in his own right as well as the difficulties which generally surround a minor's ability to vindicate, by his own initiative, his legal rights, our statutes of limitations applicable to personal injury suits have traditionally been tolled for minors. Section 516.170, RSMo Cum.Supp.1984. The prosecution of an action by a guardian or next friend is an option available to the minor; failure of a next friend to bring the action during minority does not, however, destroy the cause of action, generally speaking. Nor for that matter does the running of a statute of limitations *technically* "destroy" a minor plaintiff's right of action: it merely bars the maintenance of the action and leaves the injured party without a remedy. *See generally, Herrman v. Dixon*, 285 S.W.2d 716 (Mo.App.1956). Thus, the general tolling provisions of § 516.170 preserve the cause of action for a minor and safeguard the minor's constitutionally guaranteed right of access to the courts—even if parents, guardians or others having custody of a child *fail* to protect the child's legal rights.

■ The statutory limitation period, as applied to minors, violates their right of access to our courts [8] under Mo. Const. art.

---

Texas Ins.Code Ann. art. 5.82 (Vernon 1975) (repealed 1977).

**7.** Texas is not the only jurisdiction which has held a state medical malpractice limitations statute unconstitutional as applied to minors. *See Barrio v. San Manuel Div., Magma Copper*, 143 Ariz. 101, 692 P.2d 280 (1984) (statute unconstitutional under Arizona's state constitutional guarantee against abolition of the fundamental right to recover damages by way of a common law action); *Carson v. Maurer*, 120 N.H. 925, 424 A.2d 825 (1980) (statute violates state constitution because it contravenes equal protection principles); *Schwan v. Riverside Methodist*

*Hosp.*, 6 Ohio St.3d 300, 452 N.E.2d 1337 (1983) (statute declared unconstitutional under state equal protection analysis).

**8.** According to defendant, the result we reach today is foreclosed by our decision in *Laughlin v. Forgrave*, 432 S.W.2d 308 (Mo.1968). Our decision in *Laughlin*, however, does not speak to the issues raised in the present case—because in *Laughlin* we decided only that the medical malpractice statute of limitations in force at that time, § 516.140, RSMo 1959, was not tolled until the damage complained of was discovered.

In the course of our decision we also reaffirmed the unquestioned right of the legisla-

I, § 14 and renders vacant the guarantee contained in this constitutional provision which declares in no uncertain terms "that the courts of justice shall be open to every person, and certain remedy afforded for every injury to person. . . ." To the extent that it deprives minor medical malpractice claimants the right to assert their own claims individually, makes them dependent on the actions of others to assert their claims, and works a forfeiture of those claims if not asserted within two years, the provisions of § 516.105 are too severe an interference with a minors' state constitutionally enumerated right of access to the courts to be justified by the state's interest in remedying a perceived medical malpractice crisis.

Our society takes great pride in the fact that the law remains forever at the ready to "jealously guard" the rights of minors. Section 516.105, RSMo 1978 arbitrarily and unreasonably denies them a set of rights without providing any adequate substitute course of action for them to follow. We consider § 516.105, RSMo 1978, as it pertains to minors, a statutory aberration which runs afoul of our state Constitution and we accordingly hold it constitutionally infirm.

The judgment is reversed and the case remanded to the circuit court for further proceedings.[9]

HIGGINS, C.J., and RENDLEN, J., concur.

ROBERTSON, J., concurs in separate opinion filed.

BLACKMAR, DONNELLY and WELLIVER, JJ., dissent in separate opinions filed.

ROBERTSON, Judge, concurring.

I concur in the result reached in the principal opinion.

In 1976, the 78th General Assembly, Second Regular Session, adopted three laws designed to address the issue of medical malpractice. H.C.S.S.C.S.S.B. 472 provided additional authority in the State Board of Registration for the Healing Arts for the licensing and discipline of physicians. § 334.100, RSMo 1978. H.C.S.S.S.S.C.S.S.B. 471 created a professional liability review board designed to mediate claims of professional malpractice prior to the filing of an action in the circuit court. Chapter 538, RSMo 1978. C.C.S.S.C.S.S.B. 470 imposed, *inter alia*, the special statute of limitations for medical malpractice which is before this Court in the instant litigation.

In *State ex rel. Cardinal Glennon Memorial Hospital for Children v. Gaertner*, 583 S.W.2d 107 (Mo. banc 1979), this Court struck down the provisions of Chapter 538, on the ground that that legislation violated our constitutional guarantee of access to the courts. Mo. Const. art. I, § 14. The Court stated:

> The right of access to the courts is said to trace back to Magna Charta. *DeMay v. Liberty Foundry Co.* 327 Mo. 495, 506, 37 S.W.2d 640, 645 (1931). It has been held to be an aspect of the right to petition the government contained in the First Amendment to the United States Constitution. *California Motor Transport Company v. Trucking Unlimited*,

ture to enact statutes of limitations, but we also noted in the same breath that the legislature is not empowered to create a statute of limitations which would be "unreasonable"—that is one which would infringe upon an enumerated constitutional right. Though we found the operation of the particular statute of limitations in *Laughlin* to be harsh and our decision distasteful, we nevertheless concluded that the plaintiff failed to demonstrate how the statute was constitutionally infirm. In the present case, however, the plaintiff has succeeded at this task. Our holding in *Laughlin* does not remedy the

constitutional infirmity present in § 516.105, RSMo 1978.

9. The dissent of WELLIVER, J., conjures up and then knocks down the dual straw men of due process and equal protection. The dissent of DONNELLY, J., creates a third diversion. As we carefully note this case is narrowly ruled under the open courts guarantee found in Mo. Const. art. I, § 14. Questions concerning limiting the amount of recovery, "caps", and other statute of limitations relating to minors are not before us in this case.

404 U.S. 508, 510, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). Most importantly, it is explicitly preserved in the Constitution of Missouri.

*Cardinal Glennon, supra* at 110.

This Court's decision today is the natural born, legitimate offspring of *Cardinal Glennon.* While one of the members of the majority in *Cardinal Glennon* now questions the wisdom of his vote in that case, *see* dissenting opinion of Welliver, J., fn. 4, *Cardinal Glennon* remains the law until a majority of the members of this Court determine otherwise. My concurrence in this case adheres to the precedent which *Cardinal Glennon* establishes.

The ground upon which the principal opinion rests—access to the courts—is narrow. It does not implicate, in my view, the broader concerns of the due process and equal protection guarantees of our constitution. The well-researched dissent of Welliver, J., reads the principal opinion far more broadly than I do.

Nor does this decision necessarily portend ill for the legislature's current effort to revamp the law of medical malpractice. That legislation is not presently before us; we may not now judge its adherence to constitutional standards. Those who would attack that legislation should find no greater comfort in the principal opinion than already exists in *Cardinal Glennon.*

BLACKMAR, Judge, dissenting.

Two assumptions necessarily underlie the statute in issue, as follows: (1) parents, guardians, or others having custody of children may be depended upon to protect the children's legal rights, and (2) a child of the age of 10 and above is able to advise his custodian of any physical problems which might indicate a need for inquiry as to possible medical malpractice.

These assumptions are not unreasonable, and the legislature is entitled to make them in balancing the interests of claimants and defendants, while drafting a statute of limitation. The statutes of limitation on wrongful death actions,[1] and on securities claims,[2] have been held to run against minors. Any protection, then, must necessarily come from parents or guardians. Any suggested distinction between actions created by statute and those existing at common law is lacking in constitutional substance. The matter is one for legislative choice.

In the view I take, it makes no difference that §§ 507.110–120, RSMo 1978 and our Rule 52.02(a) limit the ability of minors to sue in their own names. A newly enacted statute should not fail because of conflict with previous statutes or rules. It should rather be assumed that the legislature intended the newly enacted statutory provisions to be effective, anything in the existing body of statutory law to the contrary notwithstanding. Conflicting provisions, then, should be considered to have been impliedly repealed pro tanto.[3]

Although I doubt that a court would turn aside a minor of any age who sought protection of legal rights, and would find im-

1. *See, e.g. Crane v. Riehn,* 568 S.W.2d 525 (Mo. banc 1978) (superseded by statute as stated in *State ex rel. Research Medical Center v. Peters,* 631 S.W.2d 938 (Mo.App.1982)); *Kausch v. Bishop,* 568 S.W.2d 532 (Mo. banc 1978); *Edmonsond v. Lakeside Hospital,* 562 S.W.2d 361 (Mo. banc 1978) (all holding minors to the provisions of the former Missouri wrongful death statute which prevented minors from bringing suit more than one year following the death of a parent if a parent of the decedent was alive).

2. *Buder v. Merrill Lynch, Pierce, Fenner & Smith,* 486 F.Supp. 56 (E.D.Mo.1980), *aff'd.,* 644 F.2d 690 (8th Cir.1981).

3. The majority opinion holds that § 516.105, RSMo 1978 is unconstitutional because it violates art. I, § 14 of the Missouri Constitution—the open courts provision. At least one other state has considered a similar challenge to a similar law. In *Rohrabaugh v. Wagoner,* 274 Ind. 661, 413 N.E.2d 891 (1980), the court found that a law which imposed a two-year statute of limitations for malpractice, with the exception that minors under the age of six could bring suit up to their eighth birthday, was not a violation of the open courts provision of the Indiana Constitution. Appellant tries to distinguish *Rohrabaugh* because Indiana does not prevent minors from bringing suit. However, for the reasons stated in the text paragraph, such a distinction is unimportant.

**14**

plied authority to make such appointments as are necessary to protect the minor's interest, I would not argue with the suggestion in the principal opinion that it is unrealistic to expect minors to take steps to further their own legal rights. The essential question, then, is whether the legislature may provide that these rights must be protected by parents or guardians, under pain of being barred. I believe that the legislature may do this, and that the possibility that some minors may not have effective or alert guardians does not raise an issue of constitutional significance.

Any statute of limitations may operate harshly in a particular case, by barring an apparently meritorious claim, even though the injured party lacks means of protection.[4] It is not for us to say whether there is or is not a malpractice crisis. It is sufficient that the legislature may legitimately concern itself with the possibility that health providers will be at severe disadvantage if forced to defend themselves against claims based on long past events. The legislature may balance the hardship to the defendants against the possibility that some plaintiffs may lose valid claims.[5] It is our duty to uphold legislation as against constitutional challenges, unless unconstitutionality is firmly demonstrated. I am unable to find such a demonstration here, either under Art. I, §§ 10 and 14 of the Missouri Constitution or the due process clause of the Fourteenth Amendment.

The statute permits the great majority of claimants to protect themselves. It should not fail in its entirety simply because its operation is not in all counts perfect.

The principal opinion conjures up the specter of the child whose parents are so indifferent or unsophisticated that they would let a valid claim lapse. I seriously doubt that this child will suddenly wake up at age 18, so that suit may be filed within the required number of years. Far more often, I suspect, the minor's suit is delayed for strategic reasons. The right of the parents to sue for their own damages on account of the minor's injury (as, we are told, the parents of this plaintiff have done) gives reason to believe that, in the great majority of cases, they will take care to protect the child's interest. The legislature is entitled to proceed in accordance with its appraisal of the greatest good for the greatest number. We should not interfere with its choice, except in extreme cases.

A further fault in the principal opinion is that it apparently disables the legislature from enacting a statute of limitations governing any common law action which runs during minority. It would apparently not be possible to have a statute which runs in cases such as this one, in which the parents are perfectly aware of the minor's claim, but which admits exceptions when the minor can show, upon reaching majority, that parents or guardians were incapable of providing protection (Oliver Twist). We should be careful not to unduly circumscribe the legislative power.

I would affirm the judgment.

DONNELLY, Judge, dissenting.

In my view, it serves no useful purpose to address a question of whether the legislature has acted unwisely.

The issue on this appeal is one of classification between minors: When the General Assembly amended § 516.170 in 1976 to deprive certain minors (*see* § 516.105) of its tolling provisions (*economic* rights), did it render § 516.105 a special law and therefore a violation of Mo. Const. art. III, § 40(6)?

I think not. On the record before us, I cannot say that the General Assembly's

---

4. *See, e.g., Laughlin v. Forgrave,* 432 S.W.2d 308 (Mo. banc 1968), where this Court held that a woman was barred by the statute of limitations then in effect even though she did not discover the injury until after the statutory time limit.

5. Courts in other states have upheld similar statutes against constitutional challenges on the ground that the legislature's classification was reasonable. *Kite v. Campbell,* 142 Cal.App.3d 793, 191 Cal.Rptr. 363, 367 (1983); *Licano v. Krausnick,* 663 P.2d 1066, 1068 (Colo.App.1983); *Rohrabaugh v. Wagoner,* 274 Ind. 661, 413 N.E.2d 891 (1980).

action is without "rational justification." *United States v. Kras,* 409 U.S. 434, 446, 93 S.Ct. 631, 638, 34 L.Ed.2d 626 (1973).

I respectfully dissent.

WELLIVER, Judge, dissenting.

I respectfully dissent.

The obvious flaw in the principal opinion lies in the ease with which it reaches its conclusion without constitutional analysis and without the application of a constitutional test or standard. Under the guise of construing our State Constitution, a majority of this Court has emasculated the legislature's latest effort to deal with the malpractice crisis and the crisis of escalating medical costs. This they have done while the legislature was considering further limitation and restriction of the existing law of malpractice. Such action is reminiscent of the *Lochner* era, as it came to be known,[1] when state and federal courts acted like super-legislatures in striking down legislation not consistent with their own views.

The principal opinion correctly suggests that in some instances state constitutions offer protections not secured by the Bill of Rights of the United States Constitution, but it is in the area of rights of criminal defendants and certain fundamental rights such as free speech that judges and commentators generally have urged state courts to delve into their own state constitutional provisions, not in the area of protecting and expanding tort litigation. *See generally* Brennan, State Constitutions and the Protection of Individual Rights, 90 Harv.L.Rev. 489 (1977); Howard, State Courts and Constitutional Rights in the Day of the Burger Court, 62 U.Va.L.Rev. 873 (1976); Liberal Trend?: State Constitutions Gain Sway, 72 A.B.A.J. 20 (January 1986); Linde, First Things First: Rediscovering the State's Bills of Rights, 9 U.Balt. L.Rev. 379 (1980); Symposium, The Role of a Bill of Rights in A Modern State Consti-

tution, 45 Wash.L.Rev. 453 (1970); Wilkes, The New Federalism in Criminal Procedure: State Court Evasion of the Burger Court, 62 Ky.L.J. 421 (1974); Williams, State Constitutional Law Processes, 24 Wm. & Mary L.Rev. 169 (1983); *Vermont v. Jewett,* 500 A.2d 233 (Vt.1985). However, state courts seeking to base decisions on provisions of their own state constitutions are obliged to conduct a constitutional analysis of their own constitutions in the same fashion as a constitutional inquiry under the federal constitution. *See* Nettik-Simmons, Towards A Theory of State Constitutional Jurisprudence, 46 Mont.L.Rev. 261 (1985).

Examination of Mo. Const. art. I, § 14 indicates that this section is but another due process clause. *Cf. Sax v. Votteler,* 648 S.W.2d 661, 664 (Tex.1983) (court held that its "Open Courts Provision" was a second due process clause).

A majority of state constitutions contain language similar to that in Mo. Const. art. I, § 14. The origin of this language is well known and can be traced back to the Magna Carta, chapter 40:

To no one will we sell, to none will We deny or delay, right or justice.

This line followed the language in the Magna Carta securing what is now called "due process of law." Magna Carta, Ch. 39. Chapter 40 was "intended as a death-blow to the corrupt judiciary in demanding oppressive gratuities for giving or withholding decisions in pending cases." *Henderson v. State,* 137 Ind. 552, 36 N.E. 257, 260 (1894). *See generally Knee v. Baltimore City Pass. Ry. Co.,* 87 Md. 623, 40 A. 890, 892–93 (1898); *Lommen v. Minneapolis Gas Light Co.,* 65 Minn. 196, 68 N.W. 53, 54 (1896); *Conley v. Woonsocket Inst.,* 11 R.I. 147 (1875); *Harrison Pepper, & Co., v. T.J. Willis,* 7 Tenn. 35, 48–9 (1871); *State v. Cadigan,* 73 Vt. 245, 50 A. 1079, 1081 (1901). The noted constitutional scholar, A.E. Dick Howard, explains:

---

1. *See generally* A. Paul, Conservative Crisis & the Rule of Law: Attitudes of Bar & Bench, 1870–1895 (1976); B. Siegan, Economic Liberties and the Constitution (1980); Currie, The Constitu-

tion in the Supreme Court: The Protection of Economic Interests," 52 U.Chi.L.Rev. 324 (1985).

Because the oppressions of the King and the unjust exactions of officials often went unredressed through failure to abide by legal procedures and the laws of the realm, Magna Carta pays special attention to the machinery of justice and carefully spells out where courts are to sit, what procedures shall be followed, and how punishments can be meted out. * * * Prior to Magna Carta the courts followed the person of the King wherever he went. Persons seeking justice therefore had to undergo the expense, delay, and frustrations of pursuing the King in his constant movements about the countryside; indeed, one plaintiff followed the King through England and France for five years before his case could be heard.

. . . .

Chapter 40 states, "To no one will We sell, to none will We deny, delay, right or justice." This does not mean that litigants in the courts can expect to be charged no fees at all; *it simply means that justice is not an article of trade, and its price is not to be determined according to what the market will bear.* In King John's time chapter 40 served to eliminate at least the worst abuses; as a standard to guide the administration of justice in later centuries, its influence was great. If taken to mean that the courts should be open to rich and poor alike, it commends itself to modern times as well.

Howard, Magna Carta: Text and Commentary 12, 15 (1964) (emphasis added). *See also* W. McKenchnie, Magna Carta: A Commentary on the Great Charter of King John 459 (1905); H. Taylor, The Origin and Growth of the English Constitution 389 (1890); R. Thomson, An Historical Essay on the Magna Charta of King John 229 (1829). Despite Chapter 40, the evils the chapter was designed to remedy persisted in English practice during our country's colonial period. One need only read Blackstone's Commentaries, 3 Blackstone 267–69 (1768), or Charles Dickens or the following excerpt from an eminent legal historian to grasp the problem that concerned Englishmen and ultimately Americans:

Heart-breaking delays and ruinous costs were the lot of suitors. Justice was dilatory, expensive, uncertain, and remote. To the rich it was a costly lottery: to the poor a denial of right, or certain ruin. The class who profited most by its dark mysteries were the lawyers themselves. A suitor might be reduced to beggary or madness, but his advisers revelled in the chicane and artifice of a lifelong suit and grew rich. Out of a multiplicity of forms and processes arose numberless fees and well-paid offices. Many subordinate functionaries, holding sinecure or superfluous appointments, enjoyed greater emoluments than the judges of the court; and upon the luckless suitors, again, fell the charge of these egregious establishments. If complaints were made, they were repelled as the promptings of ignorance: if amendments of the law were proposed, they were resisted as innovations. To question the perfection of English jurisprudence was to doubt the wisdom of our ancestors . . . a political heresay which could expect no toleration.

T. May, Constitutional History of England 384 (Holland ed.1912). Colonists were well aware of the potential for corruption in the administration of justice [2] and they included in their colonial charters or state constitutions provisions taken from chapters 39 and 40 of the Magna Carta. For the most part, Missouri's Bill of Rights, which includes what is now Mo. Const. art. I, § 14, was drafted in accord with Bill of Rights found in earlier constitutions from other states. The provision originally appeared

---

**2.** *See generally* B. Bailyn, The Ideological Origins of the American Revolution (1967); R. Ellis, The Jeffersonian Crisis: Courts and Politics in the Young Republic (1971); J.G.A. Pocock, the Machiavellian Moment: Florentine Political Thought and the Atlantic Republic Tradition 506–52 (1975); J.R. Pole, Political Representa-

as the State's general due process clause.[3] Mo. Const. art. XIII, § 7 (1820). *See generally* F. Shoemaker, The First Constitution of Missouri, 6 Mo.Hist.Rev. 51 (1912). *See also* Shoemaker, A Sketch of Missouri Constitutional History During the Territorial Period, 9 Mo.Hist.Rev. 1 (1914).

Present Mo. Const. art. I, § 14 has been interpreted on many occasions by our courts.[4] The opinions, together with the

3. The language suggesting that a remedy should be afforded for every injury to person, property or character is drawn from the ancient common law maxim which developed in response to the English writ system.

> Whenever, it became necessary to enlarge the scope of the King's Court, the change could be effected simply by the invention of a new set of forms, and so the early development of jurisdiction of the King's Court very closely resembles the enlargement of the sphere of an administrative body by means of the invention of new administrative routines. Once the habit was formed, future development for a long time seemed simple. Glanvill had described a royal court which had very little interest in enlarging its jurisdiction beyond certain matters. Two generations later Bracton described this same court and shows us how greatly it had elaborated its machinery; indeed, Bracton was even ready to contemplate an indefinite expansion of the common law in virtue of which the King's Court was to administer a law as rich in its variety and as wide in its extent as Roman law itself. The means whereby such a prodigious expansion was to be effected was the invention of new forms of action; many new forms were invented by Bracton's hero Raleigh, and Bracton had no hesitation in saying that there will be as many forms of action as there are cause of action. "There ought to be a remedy for every wrong; if some new wrong be perpetrated then a new writ may be invented to meet it." This was a bold programme. It contemplated special sets of forms through which the King's Court would exercise general jurisdiction and afford a remedy for every wrong.

T. Plucknett, A Concise History of the Common Law 354 (1956). Blackstone observed:

> [I]t arises principally from the excellence of our English laws; which adapt their redress exactly to the circumstances of the injury, and do not furnish one and the same action for different wrongs, which are impossible to be brought within one and the same description: whereby every man knows what satisfaction he is entitled to expect from the courts of justice, and as little as possible is left in the breast of the judges, whom the law appoints to administer, and not to prescribe the remedy. And I may venture to affirm, that there is hardly a possible injury, that can be offered either to the person or property of another, for which the party injured may not find a

remedial writ, conceived in such terms as are properly adapted to his own particular grievance.

3 Blackstone Commentaries 266 (1768). Such a principle of law assures that "for any wrong, recognized as such by the law, a person shall have a remedy to obtain the redress to which he is entitled according to the principles of law." *Francis v. Western Union Tel. Co.,* 58 Minn. 252, 59 N.W. 1078, 1079 (1894). *See also Cheswold Volunteer Fire v. Lambertson Const.,* 462 A.2d 416, 422 (Del.Super.Ct.1983).

4. In *Landis v. Campbell,* 79 Mo. 433, 439 (1883), the court held that the provision only was designed to assure equal access to the administration of justice when the law recognized a wrong. *See also Quinn v. Buchanan,* 298 S.W.2d 413, 417 (Mo. banc 1957). *Cf. State ex rel. National Refining Co. v. Seehorn,* 344 Mo. 547, 127 S.W.2d 418, 424 (1939). Similarly, in *Schulte v. Missionaries of LaSalette Corp. of Mo.,* 352 S.W.2d 636, 641 (Mo.1961), the Court observed that "[s]ection 14, Art. I, was never intended to create rights, but merely to protect citizens in enforcing rights recognized by the law without discrimination." A previous case had expounded on the concept of rights recognized by law and held that it referred to common law actions subject to judicial or legislative change. *DeMay v. Liberty Foundry Co.,* 327 Mo. 495, 37 S.W.2d 640, 645–48 (1931). Another decision suggests that it prohibits the legislature from encroaching upon the province of the judiciary. *Ex Parte French,* 315 Mo. 75, 285 S.W. 513, 515 (1926). Yet another opinion relates that the provision "means that persons will not be barred from Missouri courts in cases where there is proper venue and jurisdiction of the parties and the subject matter." *Collar v. Peninsular Gas. Co.,* 295 S.W.2d 88, 93 (Mo.1956). *See also Loftus v. Lee,* 308 S.W.2d 654, 661 (Mo.1958); *State ex rel. Southern Ry. Co. v. Mayfield,* 362 Mo. 101, 240 S.W.2d 106, 108 (banc 1951).

More recently, this Court discussed art. I, § 14 in *State ex rel. Cardinal Glennon Memorial Hospital v. Gaertner,* 583 S.W.2d 107 (Mo. banc 1979). In that case, this Court held only that the legislature cannot prohibit a litigant from filing his or her malpractice action *before* submitting the claim to the Board. *Cardinal Glennon* obviously suggests a broader application of art. I, § 14 than any of our prior cases. The passage of time and subsequent decisions from other jurisdictions persuades me that Morgan, J. dissenting, with whom Judge Rendlen concurred, did more accurately analyze the consti-

constitutional history of § 14, recognize that this section together with Mo. Const. art. XIII, § 9 (1820) constituted our then due process clause. After the adoption of the general due process clause, Mo. Const. art. II, § 30 (1875) (now art. I, § 10), in the form of the fourteenth amendment to the United States Constitution, retention of art. I, § 14 as a part of our state concept of due process requires that it be examined and interpreted in accordance with the same standards and tests that are employed in any due process analysis.

Today, the majority of jurisdictions treat challenges under their state "Open Courts Provision" in the same fashion as a due process challenge.[5] *See Hartford Fire Ins. v. Lawrence, Dykes, Goodenberger,* 740 F.2d 1362 (6th Cir.1984); *Cheswold Volunteer Fire Co. v. Lamertson Const. Co.,* 462 A.2d 416, 422 n. 9 (Del.1983); *Nelms v. Georgian Manor Condominium Ass'n, Inc.,* 453 Ga. 410, 321 S.E.2d 330 (1984); *Crier v. Whitecloud,* 455 So.2d 1279 (La.Ct. App.1984); *Klein v. Catalano,* 386 Mass. 701, 437 N.E.2d 514, 519 n. 6 (1982); *Saultz v. Funk,* 64 Ohio App.2d 29, 410 N.E.2d 1275 (1979). At least one jurisdiction has held that the constitutional provision was directed toward the action of courts and not the legislature. *Reeves v. Ille Electric Co.,* 170 Mont. 104, 551 P.2d 647, 650

(1976). *See also Harmon v. Angus R. Jessup Associates, Inc.* 619 S.W.2d 522, 524 (Tenn.1981). Many courts have held that the legislature may abolish a common law cause of action, regardless of the presence of such a constitutional provision. *See Hartford Fire Ins. v. Lawrence, Dykes, Goodenberger, supra.* The provision does not prohibit imposing reasonable limits upon the time within which one must seek redress in the court. *See Phelan v. Hanft,* 471 So.2d 648, 649 (Fla.Dist.Ct.App. 1985); *Academy Park Imp. v. City of New Orleans,* 469 So.2d 2, 3 (La.Ct.App.1985); *Rosnick v. Marks,* 218 Neb. 499, 357 N.W.2d 186, 191 (1984). *See also Noetzel v. Glascow, Inc.,* 338 Pa.Super. 458, 487 A.2d 1372, 1378 (1985); *Walsh v. Gowing,* 494 A.2d 543, 547 (R.I.1985). While the initial question of reasonableness is up to the legislature, it is still the province of the courts to determine if the challenged restriction is arbitrary and unreasonable and thereby denies a litigant due process. Such an inquiry should apply equally to statute of limitations in all areas, filing fees in all areas, and all other similar restrictions.

It seems clear, therefore, that the challenged statute neither violates Mo. Const. art. I, § 10 nor Mo. Const. art. I, § 14 unless it is plainly unreasonable.[6] In

tutional challenges and what has proved to be *the view of the majority of jurisdictions.*

**5.** Some courts and commentators merely presume knowledge of the intended directive of this constitutional language and proffer a different view fashioned out of whole cloth. *See generally* Bass, Article I, Section 21: Access to Courts in Florida, 5 Fla.Stat.L.Rev. 871 (1977).

**6.** There should be no doubt that the vast array of medical malpractice statutes pose no serious federal constitutional challenge. Federal courts routinely recognize that state legislatures may abolish, limit, and restrict the recovery for common law causes of action as long as there is no impairment of a vested legal right. *See Hartford Fire Ins. v. Lawrence, Dykes, Goodenberger,* 740 F.2d 1362 (6th Cir.1984); Lauter, High Court Rejects Challenge to California Fee "Cap," National Law Journal, December 2, 1985, at 5. Consequently, the statute must, almost of necessity, be analyzed under state constitutional challenges.

Under the United States Constitution, access to the courts is embraced within the due process clause only when a fundamental right or interest is involved. *See generally Walters v. National Ass'n of Radiation Survivors,* — U.S. —, 105 S.Ct. 3180, 87 L.Ed.2d 220 (1985); *Ortwein v. Schwab,* 410 U.S. 656, 93 S.Ct. 1172, 35 L.Ed.2d 572 (1973); *United States v. Kras,* 409 U.S. 434 (1973); *Boddie v. Connecticut,* 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971). The issue generally arises in cases involving criminal defendants and litigation access fees. *See generally* Michelman, The Supreme Court and Litigation Access Fees: The Right to Protect One's Rights, 1973 Duke L.J. 1153; Annot., Access to Courts, 52 L.Ed.2d 779 (1978). Moreover, the right to petition government for grievances is a first amendment free speech guarantee assuring citizens free speech before the legislative body and is not implicated by a malpractice statute. *See generally McDonald v. Smith,* — U.S. —, 105 S.Ct. 2787, 86 L.Ed.2d 384 (1985).

*Laughlin v. Forgrave,* 432 S.W.2d 308 (Mo. banc 1968), this Court stated the general rule that,

> [t]he legislative branch of the government has the power to enact statutes of limitations and inherent in that power is the power to fix the date when the statute commences to run. Statutes of limitations are favorites of the law and will not be held unconstitutional as denying due process unless the time allowed for commencement of the action and the date fixed when the statute commences to run are clearly and plainly unreasonable.

*Laughlin v. Forgrave, supra,* at 314. *See also Caccarelli v. Casey Canadian Mines, Ltd.,* 757 F.2d 548, 555 (3d Cir.1985). This Court already has upheld the general two year statute of limitations for a claim against a health care provider. *Ross v. Kansas City Gen. Hospital & Medical Center,* 608 S.W.2d 397 (Mo. banc 1980); *Laughlin v. Forgrave, supra.* The inquiry, then, should turn on whether it is unreasonable to apply this same rule to minors over the age of ten.

It is not unreasonable for the legislature to expect or require that others protect the interests of a minor. When balancing the need to assure health care providers and their insurers that potentially stale claims will not be brought some ten to twenty years after the alleged malpractice against the needs of minors who are victims of medical malpractice, ours is not the only legislature that presumed parents, guardians or others would protect a minor's rights.[7] "A majority of states have changed their statutes of limitation as these apply to minors, no longer permitting suit for injury during minority to be brought by claimants when they reach majority." P. Danzon, The Frequency and Severity of Medical Malpractice Claims 48 (1982). Most of these states to some extent followed the ABA proposal which recommended applying the statute of limitations to minors except that a "minor's representative" should have until the minor's eighth birthday to commence a suit. ABA, 1977 Report of the Commission on Medical Professional Liability. I, therefore, cannot believe that it is unreasonable, from a constitutional perspective, for our legislature to expect that others will protect a minor's rights. Indeed, in almost all areas, the law expects that parents or guardians will look after and protect the child's interest. Absent the presence of a fundamental right, parents are expected and allowed to exercise broad decision-making authority over their children. *See Bellotti v. Baird,* 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979); *Parham v. J.R.,* 442 U.S. 584, 602–03, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979). The statute, therefore, should pass constitutional muster under a due process analysis.

The principal opinion's reliance on some of the jurisdictions of the minority view is misplaced. The Arizona court applied a strict *scrutiny analysis* because of a specific constitutional provision creating a fundamental right to recover damages for negligence; this analysis led the court to strike down the state's general statute of limitation and the one as applied to minors. *See Barrio v. San Manuel Div. Hosp., Magma Copper,* 143 Ariz. 101, 692 P.2d 280 (1984); *Kenyon v. Hammer,* 142 Ariz. 69, 688 P.2d 961, 973 (1984). That court's reasoning would require that we overrule *Laughlin v. Forgrave, supra,* and strike down all of § 516.105. The same would be true under the reasoning of *Carson v. Maurer,* 120 N.H. 925, 424 A.2d 825 (1980), wherein the court invalidated a statute abrogating the discovery rule and applying the statute of limitations to minors because the challenged classifications failed to satisfy *a middle-tier scrutiny* under an equal protection analysis. The reasoning adopted by the Texas court, holding that the analysis is governed by a two-step balancing test under its state's two due process clauses, would also require that we overrule *Laughlin. Neagle v. Nelson,* 685 S.W.2d 11 (Tex.

---

7. The provision is not a traditional statute of limitations which specifies a time period after which an accrued cause of action becomes barred; rather, the statute is more accurately described as a statute of repose.

1985); *Nelson v. Krusen,* 678 S.W.2d 918 (Tex.1984); *Sax v. Votteler,* 648 S.W.2d 661 (Tex.1983). *Cf. Desemo v. Gafford,* 692 S.W.2d 571 (Tex.App.1985). It might be noted that a major factor in the balancing test employed in *Sax* is that under Texas law minors may not initiate their own suit and any attempts to do so are subject to abatement. *See generally* Keith, The Texas Medical Liability and Insurance Improvement Act—A Survey and Analysis of Its History, Construction and Constitutionally, 36 Baylor L.Rev. 265 (1984); The Law of Texas Medical Malpractice, 22 Houston L.Rev. 1, § 8 (1985); Comment, *Sax v. Votteler:* The Texas Supreme Court Prescribes Strong Medicine for the Legislature, 21 Houston L.Rev. 295 (1984).

Appellant also argues that the statute violates her rights to equal protection. It is well settled that such challenged classifications which neither burden a fundamental right nor implicate a suspect class will be upheld if the classification is rationally related to a legitimate state interest. *State Bd. of Registration v. Giffen,* 651 S.W.2d 475, 479 (Mo. banc 1983). I believe that the classification of minors who are tort victims of a health care provider and minors who are victims of other tortfeasors is rationally related to the legitimate state interest of controlling malpractice insurance costs.[8] *See generally* Redish, Legislative Response to the Medical Malpractice Insurance Crisis: Constitutional Implication, 55 Tex.L.Rev. 759 (1977); *Brubaker v. Cavanaugh,* 741 F.2d 318 (10th Cir.1984); *Hargett v. Limberg,* 598 F.Supp. 152, 157–58 (D.Utah 1984); *Reese v. Rankin Fite Mem. Hospital,* 403 So.2d 158, 160–61 (Ala. 1981); *American Bank & Trust Co. v. Community Hospital,* 36 Cal.3d 359, 204 Cal.Rptr. 671, 678, 683 P.2d 670 (1984); *Kite v. Campbell,* 142 Cal.App.3d 793, 191 Cal.Rptr. 363, 366–67 (1983); *Licano v. Krausnick,* 663 P.2d 1066, 1068 (Colo.App.

1983); *Anderson v. Wagner,* 79 Ill.2d 295, 37 Ill.Dec. 558, 402 N.E.2d 560, 562 (1979); *Rohrabaugh v. Wagoner,* 274 Ind. 661, 413 N.E.2d 891, 893 (1980); *McCarroll v. Doctors Gen. Hospital,* 664 P.2d 382 (Okl. 1983). It is not the function of this Court to determine whether or not there exists a malpractice crisis or a medical cost crisis. These are questions of legislative fact for the people of this state to decide via their legislature. Nor do I believe that it was irrational for the legislature to distinguish between minors over ten and minors under ten. The legislature may have determined that at age ten and older a minor is old enough to become aware of the result of any medical malpractice and capable of communicating their physical complaints to their parents or others. *See Rohrabaugh v. Wagoner, supra,* 413 N.E.2d at 895.

This case does not involve an access to the courts question. The sole question is whether or not the statute of limitations set by the legislature meets muster when examined in light of due process and equal protection. The majority of jurisdictions say that such provisions are constitutional and we too should recognize the reasonableness of the action taken by our legislature. The most significant aspect of this case lies in the future precedential effect of the case. If it is unconstitutional to apply such a statute of limitation to actions for malpractice, why is it not also unconstitutional to attempt to limit the amount of recovery or place a cap on the amount of recovery in medical malpractice actions?[9] If this statute of limitations is unconstitutional because it limits access to the courts, why are not all statutes of limitations relating to minors unconstitutional for the same reason.

David Randolph Smith of the University of Vanderbilt Law Faculty, writing for the

---

**8.** In *American Bank & Trust Co. v. Community Hospital,* the court observed that 23 states and 3 federal circuits passing upon similar equal protection challenges involving malpractice statutes have upheld the constitutionality of such classifications. *American Bank & Trust Co. v. Com-*

*munity Hospital,* 36 Cal.3d 359, 204 Cal.Rptr. 671, 678 n. 10, 683 P.2d 670, 677 n. 10 (1984).

**9.** In other respects, the Court has stated that it will not examine the amount of damages. *Firestone v. Crown Center Redevelopment Corp.,* 693 S.W.2d 99 (Mo. banc 1985).

Oklahoma Law Review in an article entitled, "Battling A Receding Tort Frontier: Constitutional Attacks on Medical Malpractice Laws," suggests:

Central to this trend of judicial reversals of tort reform laws is the discovery or rediscovery of state constitutional interpretation by state court judges. In stark terms, medical malpractice remedial laws undermine a tradition that many state court judges hold dear: the personal injury suit and the plaintiff's lawyer. Because of these factors, successful personal injury tort law reform must come through federal legislation. Reliance on state legislation is very much misplaced. Smith, Battling A Receding Tort Frontier: Constitutional Attacks on Medical Malpractice Laws, 38 Okl.L.Rev. 195, 200 (1985).

I would affirm the judgment.

