Suzanne LEE and Nathan Lee Garza,
through his guardian, Suzanne Lee,
Plaintiffs and Appellants,

v.

Dr. Lynn GAUFIN, Defendant
and Appellee.

Gary GRIFFITHS, guardian ad litem for
Kevin G. Meehan and Patrick B. Mee-
han, and Marian J. Meehan, Plaintiffs
and Appellants,

v.

Dr. J. Dallas VAN WAGONER,
Defendant and Appellee.

Nos. 20995, 21063 and 900595.

Supreme Court of Utah.

Nov. 30, 1993.

Robert J. DeBry, Edward T. Wells, G. Steven Sullivan, Murray, and David M. Jorgensen, Salt Lake City, for Lee and Garza.

Elliott J. Williams, Salt Lake City, for Gaufin.

Roger P. Christensen, Richard L. Evans, Salt Lake City, for Griffiths and Meehan.

Elliott J. Williams, Kurt M. Frankenburg, Salt Lake City, for Van Wagoner.

STEWART, Justice:

These cases have been consolidated sua sponte because they raise similar issues as to the constitutionality of the statute of limitations and repose provisions in the Utah Health Care Malpractice Act (Malpractice Act or Act). In each case, the trial court held that those provisions barred the complaints. We reverse and remand for trials on the merits in both cases.

## 1. The Garza Case, Nos. 20995 and 21063

Suzanne Lee, the mother of Nathan Lee Garza, a minor, filed this medical malpractice action against Dr. Lynn Gaufin on behalf of her son for personal injuries and on her own behalf for medical expenses she incurred for her son.

Nathan Lee Garza was born August 16, 1979. In his first year, he began to experience shaking spells, and his mother took him to a pediatrician who recommended that he see defendant Dr. Lynn Gaufin, a neurologist. Dr. Gaufin examined Nathan on August 13, August 29, and October 24, 1980, and diagnosed his condition as encephalomyelitis. Approximately nine months after the first visit to Dr. Gaufin, Ms. Lee took Nathan to another doctor, who diagnosed his condition as hydrocephalus.

Ms. Lee initiated the procedure for bringing a medical malpractice suit against Dr. Gaufin by filing a notice of claim on May 6, 1983, but then instructed her attorney to

discontinue the litigation. She later changed her mind and filed a second notice of claim on November 9, 1984, and a complaint on March 8, 1985. The complaint was filed more than four years after Dr. Gaufin's diagnosis in 1980 and more than two years after the diagnosis of hydrocephalus.

Ms. Lee alleges that hydrocephalus is treatable if promptly diagnosed and that Nathan's symptoms temporarily disappeared after receiving treatment for hydrocephalus. Ms. Lee also alleges that Nathan is now mentally retarded and permanently handicapped because of Dr. Gaufin's failure to correctly diagnose his condition. The complaint asked that Ms. Lee be reimbursed for Nathan's medical expenses and that Nathan be awarded damages for his personal injuries.

Dr. Gaufin filed a motion for a judgment on the pleadings, and the trial court ruled that the two-year statute of limitations in § 78–14–4(1) of the Malpractice Act barred both Ms. Lee's claim for herself and her claim for her son.[1] The court ruled that § 78–14–4(1) and (2) of the Act "clearly demonstrate[s] the legislative intent to withdraw the protection of causes of action of minors which may have previously been afforded by reason of Section 78–12–36(1)." On appeal, Ms. Lee challenges the trial court's ruling only as to Nathan's claim for personal injuries, and not as to her claim for medical expenses.

### 2. The Meehan Case, No. 900595

Gary Griffiths, as guardian ad litem for twins Kevin G. and Patrick B. Meehan, filed a complaint on their behalf, alleging that Dr. J. Dallas Van Wagoner was negligent in delivering the twins and that his negligence caused them permanent brain damage.[2] The complaint was filed January 6, 1989, some seven and one-half years after the births. The complaint asserted that Ms. Meehan, the mother of the twins, did not discover their legal causes of action until after she had consulted with attorneys in December 1988, and that the complaint was filed within two years of her discovery of her children's negligence claims. See Foil v. Ballinger, 601 P.2d 144 (Utah 1979). Pursuant to a motion to dismiss, the district court ruled that the Meehans' personal injury claims were terminated by the four-year statute of repose in § 78–14–4(1) of the Malpractice Act. On appeal, Griffiths argues that the statute of repose and the provision in § 78–14–4(2) barring the tolling of statutes of limitations and repose as to the claims of minors are unconstitutional.

Section 78–14–4(1) of the Malpractice Act contains a statute of limitations and a statute of repose. The two-year statute of limitations runs from the time the "plaintiff or patient" discovers or "should have discovered" the injury. The four-year statute of repose runs from the time the negligent act is committed and terminates all legal remedies for malpractice not filed within four years, even if the injury caused by the mal-

---

1. Utah Code Ann. § 78–14–4 of the Malpractice Act provides:

 (1) No malpractice action against a health care provider may be brought unless it is commenced within two years after the plaintiff or patient discovers, or through the use of reasonable diligence should have discovered the injury, whichever first occurs, but not to exceed four years after the date of the alleged act, omission, neglect or occurrence, except that:
 (a) In an action where the allegation against the health care provider is that a foreign object has been wrongfully left within a patient's body, the claim shall be barred unless commenced within one year after the plaintiff or patient discovers, or through the use of reasonable diligence should have discovered, the existence of the foreign object wrongfully left in the patient's body, whichever first occurs; and

 (b) In an action where it is alleged that a patient has been prevented from discovering misconduct on the part of a health care provider because that health care provider has affirmatively acted to fraudulently conceal the alleged misconduct, the claim shall be barred unless commenced within one year after the plaintiff or patient discovers, or through the use of reasonable diligence, should have discovered the fraudulent concealment, whichever first occurs.
 (2) The provisions of this section shall apply to all persons, *regardless of minority or other legal disability* under section 78–12–36 or any other provision of the law....
 (Emphasis added.)

2. After this action was commenced, Patrick Meehan died from complications arising out of the injuries he sustained at birth.

practice could not have been discovered by the plaintiff or patient during that period.

Section 78–14–4(2) of the Malpractice Act subjects the claims of minors to the two- and four-year limitations periods by nullifying § 78–12–36, which tolls limitations periods for minors and incompetents. Section 78–12–36 states:

> If a person entitled to bring an action, other than for the recovery of real property, is at the time the cause of action accrued, either under the age of majority or mentally incompetent and without a legal guardian, the time of the disability is not a part of the time limited for the commencement of the action.

The Garza complaint was filed more than two years after Nathan's mother learned of Dr. Gaufin's alleged misdiagnosis and more than four years after Dr. Gaufin's last examination of Nathan. The Meehan complaint was filed more than seven years after Dr. Van Wagoner's alleged malpractice but less than two years after their mother first learned of their legal claims for malpractice. Thus, Nathan Garza's claim is barred by both the two- and four-year limitations provisions, and the Meehans' claims are barred by the four-year provision.

The plaintiffs in both cases contend that the provision in § 78–14–4(2) that subjects the claims of minors to the two- and four-year limitations periods is unconstitutional because it violates the uniform operation of the laws provision in Article I, section 24 of the Utah Constitution and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Plaintiffs also assert that the provision violates the due process clauses of the state and federal constitutions.[3] In addition, Griffiths argues that the four-year limitations period is a statute of repose that is unconstitutional under the guaranteed remedy provision of Article I, section 11 of the Utah Constitution and the law established in *Berry v. Beech Aircraft Corp.*, 717 P.2d 670 (Utah 1985).

## I. STATUTES OF LIMITATIONS AND REPOSE

■ As background for understanding the nature of the legal and constitutional issues pertaining to the two- and four-year limitations periods in § 78–14–4(1), we begin with a brief discussion of the nature of statutes of limitations and statutes of repose. Statutes of limitations are essentially procedural in nature and establish a prescribed time within which an action must be filed after it accrues. They do not abolish a substantive right to sue, but simply provide that if an action is not filed within the specified time, the remedy is deemed to have been waived unless the plaintiff did not know of the facts giving rise to the cause of action. *See Myers v. McDonald*, 635 P.2d 84, 86 (Utah 1981). Thus, the barring of the remedy is caused by a plaintiff's failure to take reasonable steps to assert the cause of action within the time afforded by the statute.

The fixing of a limitations period is highly judgmental and is determined by the Legislature's weighing a number of general policies, such as whether particular types of cases require speedy resolution, the nature of the evidence typically used in litigating a particular type of case, the consequences to putative plaintiffs, defendants, and third persons who might be affected by the litigation, and the interest of society at large in not leaving disputes unresolved for long periods of time. Such policy considerations often suggest different limitations periods for different causes of action, even as to actions within the same general branch of the law. Thus, the Legislature has fixed different limitations periods for different types of torts. For example, actions for wrongful death are subject to a two-year limitations period, Utah Code Ann. § 78–12–28(2); actions for slander, assault, and false imprisonment are subject to a one-year period, Utah Code Ann. § 78–12–29(4); and most personal injury actions for negligence are subject to a four-year period, Utah Code Ann. § 78–12–25; *see Retherford v. AT & T Communications, Inc.*, 844 P.2d 949, 975 (Utah 1992); *Thomas*

---

**3.** In neither case have plaintiffs briefed the state or federal due process issues or the federal equal protection issue.

*v. Union Pac. R.R.*, 1 Utah 235, 236 (1875). Similar variations occur with respect to other types of causes of action.

 The Legislature's judgment in fixing the length of a limitations period is accorded great latitude under the uniform operation of the laws provision in Article I, section 24 of the Utah Constitution. *See Allen v. Intermountain Health Care, Inc.*, 635 P.2d 30, 32 (Utah 1981); *Toronto v. Sheffield,* 118 Utah 460, 470–71, 222 P.2d 594, 599 (1950). Indeed, this Court has specifically held that, as applied to adults, the two-year limitations period for medical malpractice does not violate Article I, section 24, even though the limitations period for most other negligently caused personal injuries is four years. *Allen,* 635 P.2d at 32. The Legislature also has broad latitude to set limitations periods under the state and federal due process clauses. *See Wilson v. Iseminger,* 185 U.S. 55, 63, 22 S.Ct. 573, 575, 46 L.Ed. 804 (1902).

 Unlike statutes of limitations, statutes of repose abolish a cause of action after a certain period, even if the action first accrues after the period has expired. The four-year repose period in § 78–14–4(1) runs from the commission of the alleged act of malpractice, irrespective of whether the malpractice is known or knowable, and all causes of action for malpractice not filed within that period are abolished. To the extent that the statute of repose abolishes causes of action that could not have been sued on within the four-year period because they had not accrued, the statute acts substantively.[4] In *Raithaus v. Saab–Scandia of America,* 784 P.2d 1158, 1160 (Utah 1989), the Court stated:

[S]tatutes of repose are … not designed, as are statutes of limitations, to necessarily allow a "reasonable" time in which to file a lawsuit. A statute of repose might theoretically cut off a claim filed within the period allowed by the relevant statute of limitations.

(Citations omitted.) *Raithaus* also explained the purpose of certain types of statutes of repose, such as the one in the Malpractice Act:

Legislatures enact statutes of repose, as opposed to statutes of limitations, for specific reasons.... Statutes of repose … are generally enacted to curb rising insurance rates, to increase the availability of insurance, and to reduce the risk and uncertainty of liability for manufacturers and those in the manufacturer's chain of distribution.

*Id.* at 1161.

The stated purpose of the Malpractice Act was to curb rising malpractice insurance rates, ensure the availability of malpractice insurance, and reduce the cost of health care. Utah Code Ann. § 78–14–2. The Act sought to accomplish these objectives, inter alia, by subjecting the malpractice claims of all persons, including minors, to a shorter statute of limitations than the four-year statute of limitations applicable to most other negligence actions and by abolishing all malpractice causes of action not filed within four years of the act of malpractice.[5]

## II. UNIFORM OPERATION OF THE LAWS: LIMITATIONS ON THE MALPRACTICE CLAIMS OF MINORS

Plaintiffs argue that in denying minors the benefit of § 78–12–36, which suspends limita-

---

4. The effect of the four-year repose period differs with respect to causes of action that accrue before and after the four-year period. The statute of repose shortens the statute of limitations as to causes of action that accrue before the repose period expires. For example, when knowledge of the injury is acquired more than two years but less than four years after the act of malpractice, the repose period shortens the time in which a known action must be filed to less than the two-year statute of limitations. Thus, the nearer the end of the four-year period one acquires knowledge of the injury, the shorter the time one has to

file an action. Conceivably one could be required under the statute to file an action the same day one learned of it. That might well raise significant constitutional problems. *Wilson v. Iseminger,* 185 U.S. 55, 22 S.Ct. 573, 46 L.Ed. 804 (1902); *Toronto v. Sheffield,* 118 Utah 460, 222 P.2d 594 (1950).

5. There are, however, two exceptions to the statute of repose. Section 78–14–4(1)(a) and (b) of the Act excepts cases involving fraudulent concealment and cases involving foreign objects left inside patients.

tions periods generally as to claims of minors,.§ 78–14–4(2) denies minors the right to the uniform operation of the laws under Article I, section 24 of the Utah Constitution because it treats minors the same as adults under the malpractice limitations provisions. They also claim the statute treats minors who have medical malpractice causes of action differently from minors who have causes of action for other kinds of personal injury. Defendants reply that the Malpractice Act, on its face, treats minors and adults uniformly and therefore does not violate the uniform operation of the laws provision. Defendants also contend that even if § 78–14–4(2) does result in the nonuniform operation of the law as to minors, it is nonetheless constitutional because (1) § 78–14–4(2) is supported by a presumption of constitutionality; (2) the minimal-scrutiny or rational-basis test governs the determination of whether the nonuniform operation of the law as to minors is constitutional; and (3) even if a heightened-scrutiny test governs in determining the constitutionality of § 78–14–4(2), the malpractice insurance crisis justifies the nonuniform application of the law as to minors.

Article I, section 24 of the Utah Constitution provides, "All laws of a general nature shall have uniform operation." Although this provision is sometimes thought to have the same effect and impose the same legal standards on legislative action as the equal protection guarantee found in the Fourteenth Amendment to the United States Constitution, the language and history of the two provisions are entirely different, and even though there are important areas of overlap in the concepts embodied in the two provi-

sions, the differences can produce different legal consequences. As stated in *Malan v. Lewis*, 693 P.2d 661, 670 (Utah 1984), "The different language of Article I, § 24, the different constitutional contexts of the two provisions, and different jurisprudential considerations may lead to a different result in applying equal protection principles under Article I, § 24 than might be reached under federal law." *See also Greenwood v. City of North Salt Lake*, 817 P.2d 816, 820 (Utah 1991).

■ For a law to be constitutional under Article I, section 24, it is not enough that it be uniform on its face. What is critical is that the *operation* of the law be uniform. A law does not operate uniformly if "persons similarly situated" are not "treated similarly" or if "persons in different circumstances" are "treated as if their circumstances were the same."[6] *Malan v. Lewis*, 693 P.2d 661, 669 (Utah 1984).[7] In *State Tax Commission v. Department of Finance*, 576 P.2d 1297, 1298 (Utah 1978), the Court stated:

Equal protection protects against discrimination within a class. The legislature has considerable discretion in the designation of classifications but the court must determine whether such classifications operate equally on all persons similarly situated.

Thus, whether a classification operates uniformly on all persons similarly situated within constitutional parameters is an issue that must ultimately be decided by the judiciary.

By making both the two- and four-year limitations periods applicable to minors, § 78–14–4(2) of the Malpractice Act not only treats minors injured by a health care pro-

---

**6.** All laws, either explicitly by their terms or implicitly by exclusion from the scope of the law, create legal classifications. Justice Wolfe stated in *State v. Mason*, 94 Utah 501, 507, 78 P.2d 920, 923 (1938):

Of course, every legislative act is in one sense discriminatory. The Legislature cannot in one act legislate as to all persons or all subject matters. It is inclusive as to some class or group and as to some human relationships, transactions, or functions and exclusive as to the remainder. For that reason, to be unconstitutional the discrimination must be unreasonable or arbitrary. A classification is never unreasonable or arbitrary in its inclusion or exclusion features so long as there is some

basis for the differentiation between classes or subject matters included as compared to those excluded from its operation, provided the differentiation bears a reasonable relation to the purposes to be accomplished by the act.

**7.** *Malan* held Utah's automobile host-guest statute, which barred guest passengers in an automobile from suing host drivers, unconstitutional because the statute did not operate uniformly as to automobile guests. The Court held that the classifications of automobile guests who could and could not sue were unreasonably discriminatory and that the classifications did not actually further any conceivable legitimate legislative purpose. *Malan*, 693 P.2d at 672.

vider categorically differently from minors injured by all other defendants, but it also treats minors and adults as if they were situated the same under the law. Minors and adults are not, however, similarly situated under the law with respect to their ability to assert a claim for injuries caused by malpractice. Minors, unlike adults, have no legal capacity to sue. Their legal incapacity is based on fundamental differences between adults and minors with respect to their physical, intellectual, psychological, and judgmental maturity. If the law failed to recognize those differences, the legal rights of minors could be exploited unconscionably and the law made an instrument of oppression as to the legal rights of minors. It follows that in subjecting minors' malpractice claims to the statute of limitations, the Act operates in more than a mere regulatory fashion.

Historically, the law has recognized that special rules are necessary to protect the legal rights of children. In this and other states, courts and legislatures have generally conferred a special status on minors with respect to their legal capacity to sue and be sued. *See generally* Rob M. Alston, Note, *Utah's Statute of Limitation Barring Minors From Bringing Medical Malpractice Actions: Riding Roughshod over the Rights of Minors?* 1992 Utah L.Rev. 929. Because of their lack of experience, judgment, knowledge, resources, and awareness, minors cannot effectively assert and protect their legal rights. That is especially true in the context of medical malpractice lawsuits with respect to infants who suffer physical, mental, or emotional injuries that are not apparent and cannot be discerned or communicated by the infant until he or she reaches a later stage of development and is more mature.

Since 1852, minors in the Territory and State of Utah have had no legal capacity to sue. 1876 Compiled Laws of Utah 345; Utah Code Ann. § 15-2-1 (1992). Today, Rule 17(b) of the Utah Rules of Civil Procedure recognizes the legal incapacity of minors by requiring a minor who is a party to a lawsuit to "appear either by a general guardian or by a guardian ad litem appointed in the particular case by the court in which the action is pending." [8]

Although lawsuits asserting a violation of a minor's rights may be brought by parents, general guardians, or next friends as guardians ad litem, such persons have no legal duty to assert or otherwise protect a minor's legal claims. *See Scott v. School Bd.*, 568 P.2d 746, 747 (Utah 1977); *see also Barrio v. San Manuel Div. Hosp. for Magna Copper Co.*, 143 Ariz. 101, 692 P.2d 280, 286 (1984) (en banc); *Mominee v. Scherbarth*, 28 Ohio St.3d 270, 503 N.E.2d 717, 721 (1986). If parents and guardians fail to assert a minor's claim because they are neglectful, unavailable, or disinterested, or because they have a conflict of interest in filing a lawsuit for the minor, the minor's legal claim can never be asserted when a statute of limitations bars the cause of action before the minor reaches majority. Accordingly, the general rule for over 360 years has been that statutes of limitations are tolled for minors. *Developments in the Law—Statutes of Limitations*, 63 Harv.L.Rev. 1177, 1229 (1950).

The purpose of the law in denying minors the legal capacity to sue is to protect their legal rights. *E.g., Doe v. Durtschi*, 110 Idaho 466, 476, 716 P.2d 1238, 1248 (1986); *In re Davidson's Will*, 223 Minn. 268, 26 N.W.2d 223, 225 (1947); *Hunter v. North Mason High Sch.*, 12 Wash.App. 304, 529 P.2d 898, 899–900 (1974), *aff'd*, 85 Wash.2d 810, 539 P.2d 845 (1975). To that same end, courts have typically treated minors involved in litigation as if they were wards of the court, even when a minor has an adult representative who appears in court as a guardian ad litem. *E.g., Stone v. Gulf Am. Fire & Cas. Co.*, 554 So.2d 346, 361 (Ala.1989); *Schierenbeck v. Minor*, 148 Colo. 582, 367 P.2d 333, 334 (1961) (en banc); *Severs v. Country Mut. Ins. Co.*, 89 Ill.2d 515, 61 Ill.Dec. 137, 139, 434 N.E.2d 290, 292 (1982).

In keeping with that general policy, this Court has, with few exceptions, been vigilant in protecting minors' legal interests. Initially, the Court held that mandatory thirty-day

**8.** Utah Code Ann. § 15-2-1 defines unemancipated minors as unmarried persons under the age of eighteen.

notice-of-claim provisions, such as those imposed by statutes governing claims against municipalities and the state, barred claims of minors filed more than thirty days after the child's injury. . See *Gallegos v. Midvale City,* 27 Utah 2d 27, 30–31, 492 P.2d 1335, 1337 (1972); *Hurley v. Town of Bingham,* 63 Utah 589, 595, 228 P. 213, 215 (1924) (minors' claims barred for failing to comply with thirty-day notice provision of statute subjecting municipality to liability for dangerous sidewalks and streets); *Varoz v. Sevey,* 29 Utah 2d 158, 160, 506 P.2d 435, 436 (1973) (minor's claim barred by ninety-day notice provision in tort claims act). However, those cases were in effect overruled in *Scott v. School Board,* 568 P.2d 746 (Utah 1977). *Scott* expressly recognized that because a minor is not sufficiently mature or knowledgeable to litigate a legal claim, a minor has no legal capacity to initiate a lawsuit. *Id.* at 747. *Scott* also recognized that a parent has no legal duty to assert a child's claim on behalf of the child. *Id.*

The Court indicated in *Scott* that serious constitutional issues would be raised if a minor's claim for personal injuries were held to be barred because a parent or guardian failed to comply with the statutory thirty-day notice-of-claim provision. To avoid the constitutional issue, the Court held that the notice-of-claim provision in the Governmental Immunity Act, although not technically a statute of limitations, was tolled by the general statutory provision that tolled statutes of limitations as to minors' legal claims.[9] To hold otherwise, the Court stated, would be "a denial of due process and equal protection." *Id.* at 748. The Court further observed:

> A minor is incapable of giving notice by ... virtue of his minority, nor may he bring an action in his own behalf while a minor. He simply has no standing by statute and an action by or against a minor requires the appointment of a guardian ad litem.
>
> The parents, or natural guardians, have no specific legal duty to perform and have no responsibility to their minor off-spring other than their moral obligation.

Consequently, in matters of this kind, when a parent, [or] natural guardian, fails for one reason or another to give notice, file suit, or otherwise protect the minor's legal interests, the minor is left completely without a remedy. This was undoubtedly one of the prime considerations which prompted the legislature to toll the statute during the minority of a claimant against municipalities. Their reason for not so providing in governmental immunity cases as we are faced with here is entirely unclear. However, the general legislative intent to protect the causes of action is abundantly clear by said amendment and the specific provision of the general statute of limitations.

*Id.* at 747–48; *cf. Barrio v. San Manuel Div. Hosp. for Magna Copper Co.,* 143 Ariz. 101, 692 P.2d 280, 285–86 (1984) (en banc).

The legality of applying a statute of limitations to the detriment of a minor's interest came before the Court in a different context in *Szarak v. Sandoval,* 636 P.2d 1082 (Utah 1981). The Court held that a statute of limitations was tolled in an action for paternity and child support brought by a mother and the Utah Department of Social Services because the child, even though not a party, was the true party in interest. *Id.* at 1085; *cf. Switzer v. Reynolds,* 606 P.2d 244, 249 (Utah 1980) (tolling statute applied to minor's action for wrongful death).

Thus, the nonuniform operation of the law as to minors because of § 78–14–4(2) is patent and categorical in two respects. First, despite the historical exemption of minors' causes of action from limitations provisions generally, and despite fundamental differences between minors and adults with respect to their status in the law, the Act deals with malpractice claims of minors and adults in exactly the same manner. Second, the Act discriminates between minors who are injured by medical malpractice and minors injured by some other kind of negligence. That discrimination is not caused by applying different statutes of limitations to different causes of action; rather, the discrimination is caused by recognizing a minor's incapacity to sue in one instance but not in the other.

9. Utah Code Ann. §§ 63–30–12, –13.

Whether those discriminations against minors are constitutional depends on the standard of scrutiny to be applied in determining whether the classifications further a legitimate legislative purpose. *See Blue Cross & Blue Shield v. State,* 779 P.2d 634, 637 (Utah 1989). Defendants contend that the appropriate level of scrutiny was established in *Allen v. Intermountain Health Care, Inc.,* 635 P.2d 30, 32 (Utah 1981), which applied the rational-basis test of scrutiny in sustaining the constitutionality of the two-year statute of limitations in the Malpractice Act, as applied to an adult's malpractice claim.

■ Under the rational-basis, or least restrictive standard, a statutory classification is constitutional unless it has no rational relationship to a legislatively stated purpose or, if not stated, to any reasonably conceivable legislative purpose. *Greenwood v. City of North Salt Lake,* 817 P.2d 816, 820–21 (Utah 1991); *Blue Cross & Blue Shield v. State,* 779 P.2d 634, 637 (Utah 1989); *Mountain Fuel Supply Co. v. Salt Lake City Corp.,* 752 P.2d 884, 888 (Utah 1988); *J.J.N.P. Co. v. State,* 655 P.2d 1133, 1137 (Utah 1982); *Baker v. Matheson,* 607 P.2d 233, 244 (Utah 1979). "A presumption of constitutionality is extended to statutes ... and that presumption is sufficient to sustain the constitutionality of a classification created by the statute unless the classification creates an invidious discrimination, or bears no rational relationship to a legitimate state purpose." [10] *J.J.N.P.,* 655 P.2d at 1138. Moreover, the presumption requires a court to presume that the classification was intended to further the legislative purpose. *Jones v. State Bd. of Medicine,* 97 Idaho 859, 555 P.2d 399, 406, *cert. denied,* 431 U.S. 914, 97 S.Ct. 2173, 53 L.Ed.2d 223 (1976).

■ In *Allen,* we had no need to speculate as to what purposes the Malpractice Act was intended to serve because the purposes were set forth in § 78–14–2. The issue in *Allen* was whether a shorter statute of limitations for malpractice actions than for other personal injury actions was an irrational means for reducing malpractice insurance premiums and health care costs and ensuring the availability of health care services. No evidence was adduced to show the nature of the relationship of the classification to the stated purpose. The Court sustained the constitutionality of the classification on the ground that a shorter statute of limitations was not, *a priori,* an irrational means for achieving the purposes of the Act.[11]

Because the statute of limitations in *Allen* was applied to an adult's cause of action, the statute acted solely in a procedural fashion. However, § 78–14–4(2) acts in a substantive manner because it terminates minors' rights to sue in cases in which there has been no reasonable opportunity to file a claim. Although parents or other adults may assert a minor's legal claim in a timely manner, their failure to do so, whether because of indifference, neglect, or because the minor's injury is not apparent or detectable, does not breach any legal duty. The running of a limitations provision in such circumstances deprives the minor of any opportunity to assert a cause of action. *See generally Scott v. School Bd.,* 568 P.2d 746, 747 (Utah 1977); *Barrio v. San Manuel Div. Hosp. for Magna Copper Co.,* 143 Ariz. 101, 692 P.2d 280, 286 (1984) (en banc); *Strahler v. St. Luke's Hosp.,* 706 S.W.2d 7, 11 (Mo.1986) (en banc); *Mominee v. Scherbarth,* 28 Ohio St.3d 270, 503 N.E.2d 717, 721–22 (1986); *Nelson v. Krusen,* 678 S.W.2d 918, 923 (Tex.1984); *Sax v. Votteler,* 648 S.W.2d 661, 666 (Tex.1983). Thus, a minor's legal right to a remedy can be terminated by the Act before the minor reaches his or her majority and before the

---

10. It is true, of course, that all statutes are presumed to be constitutional. In the area of equal protection, however, the term "presumption of constitutionality" frequently has a more specific meaning. When the legislative purpose is not specifically stated in the challenged act, a court presumes that the act was based on legitimate purposes and that the classifications had a reasonable factual basis. *See generally Malan v. Lewis,* 693 P.2d 661 (Utah 1984).

11. The two-year statute of limitations as applied to an adult plaintiff is procedural, not substantive, in nature, and the legislative prerogative is therefore great. *See generally Toronto v. Sheffield,* 118 Utah 460, 222 P.2d 594 (1950). Thus, irrespective of the validity of the factual basis for the "malpractice crisis," the two-year limitations period as applied to adults is not an unreasonable discrimination.

minor has a reasonable opportunity to assert the action. The effect of § 78–14–4(2) in nullifying § 78–12–36 at the very least implicates a minor's right to a remedy by due course of law for a personal injury under Article I, section 11. *See Berry v. Beech Aircraft Corp.*, 717 P.2d 670, 676 (Utah 1985); *Horton v. Goldminer's Daughter*, 785 P.2d 1087, 1094 (Utah 1989); *Sun Valley Waterbeds v. Hughes & Son, Inc.*, 782 P.2d 188, 193–94 (Utah 1989). Therefore, the holding in *Allen* does not govern the constitutionality of either the two-year limitations period as applied to minors or the standard of scrutiny that should be applied to § 78–14–4(2).

After *Allen* was decided, *Malan v. Lewis*, 693 P.2d 661 (Utah 1984), held that a standard of scrutiny stricter than the rational-basis standard governed when a discrimination implicated a right protected by the open courts provision of Article I, section 11 of the Utah Constitution. In *Malan*, the Court stated that in applying Article I, section 24, it was necessary to distinguish between discriminations against economic or social interests and discriminations that implicated rights protected by Article I, section 11. In the latter instance, a higher standard of judicial scrutiny was required because two constitutional values must be given due recognition: (1) the policy underlying the uniform operation of the laws provision, which militates against arbitrary laws that favor the interests of the politically powerful over the interests of the politically vulnerable;[12] and (2) the policy that a person has a constitutional right to a remedy for an injury to one's person.

At issue in *Malan* was the constitutionality of the Utah Automobile Host–Guest statute, which denied an automobile guest the right to sue the host for personal injuries. Because the statute discriminated against the guest's constitutional right to a remedy under Article I, section 11, the Court applied a heightened-scrutiny standard and carefully analyzed the reasonably conceivable justifications for the statutory classification. The Court concluded that the justifications were more "fanciful than real" in furthering any legitimate legislative objective and ruled that "the statutory classifications and the different treatment given the classes must be based on differences that have a reasonable tendency to further the objectives of the statute. If the relationship of the classification to the statutory objectives is unreasonable or fanciful, the discrimination is unreasonable."[13] 693 P.2d at 670–71, 673 (citations omitted). Accordingly, the Court held the host-guest statute unconstitutional under Article I, section 24. *Id.* at 673; *cf. Brown v. Merlo*, 8 Cal.3d 855, 106 Cal.Rptr. 388, 506 P.2d 212 (1973).

After *Malan*, *Condemarin v. University Hospital*, 775 P.2d 348 (Utah 1989), came before the Court. The issue was the constitutionality of the Utah Governmental Immunity Act's $250,000 cap on damages in personal injury suits against state-owned hospitals.[14] Although the Court held the cap unconstitutional, no one opinion stated the rationale of a majority. Justices Durham and Zimmerman held the damages cap a violation of due process, while Justice Stewart held it unconstitutional under Article I, section 24. *See* 775 P.2d 348, 360 (opinion of Durham, J.); 775 P.2d at 366–69 (Zimmerman, J., concurring in part with Durham, J.); 775 P.2d at 369, 372–74 (Stewart, J., separate opinion). Notwithstanding the Court's division with respect to the constitutional basis for the result, a heightened scrutiny of legislative means and ends was held to be appro-

---

**12.** The uniform operation of the laws provision, like the equal protection provision in the federal constitution, rests in part on the proposition that "the principles of law which officials would impose upon a minority must be imposed generally." *Railway Express Agency, Inc. v. New York*, 336 U.S. 106, 112, 69 S.Ct. 463, 466, 93 L.Ed. 533 (1949) (Jackson, J., concurring). Indeed, the Utah Constitution declares that the equal protection of the law is essential to a free society. *See* Utah Const. art. I, § 2.

**13.** *Malan* did not adopt the federal equal protection analytical framework that applies one of three levels of scrutiny, depending on the nature of the interest discriminated against. *See Malan*, 693 P.2d at 674 n. 17; *accord Mountain Fuel Supply Co. v. Salt Lake City Corp.*, 752 P.2d 884, 888–90 (Utah 1988).

**14.** The Court held that the operation of a state-owned hospital was not a governmental function protected by governmental immunity and that the plaintiff therefore had a right to a remedy as protected by Article I, section 11.

priate under Article I, section 24 by both Justices Durham and Stewart. *Id.* at 356, 373. Although Justice Zimmerman did not address the appropriate level of scrutiny under Article I, section 24, his view of the importance of Article I, section 11 rights is consistent with applying a heightened level of scrutiny for purposes of Article I, section 24 when Article I, section 11 rights are implicated by a discriminatory classification.[15]

With respect to the appropriate standard of scrutiny that should be applied in Article I, section 24 cases involving a right protected by Article I, section 11, Justice Durham stated:

> Other courts have applied a heightened standard of equal protection scrutiny to statutes limiting recovery rights in the medical malpractice area. Some courts have characterized their review as one at an intermediate level, and some have referred to it as a "realistic" review under the rational basis standard. Both approaches, however, involve a real and thoughtful examination of legislative purpose and the relationship between the legislation and that purpose. In the present case, the legislature has not only limited recovery, but it has also extended partial governmental immunity to restrict rights which existed at common law. Therefore, I would apply a heightened standard of review under equal protection.

*Condemarin,* 775 P.2d at 356 (citations omitted).[16] Also, with respect to the appropriate standard of scrutiny to be applied in Article

I, section 24 cases implicating Article I, section 11, Justice Stewart clarified the Court's holding in *Malan:*

> [T]he Court in *Malan* also made clear that the great latitude allowed the Legislature in making classifications under the minimal scrutiny standard is not appropriate when a constitutional right is discriminated against. Nor should the Court indulge highly speculative hypotheses as to a statute's purpose in applying the presumption of constitutionality.
>
> The appropriate standard, in my view, has more bite than the minimum scrutiny standard but does not purport to require the Legislature to find the least restrictive manner of furthering its purpose. But neither does it allow, on the other hand, such wide latitude as to virtually abandon judicial review. The statutory classifications must be reasonable, and the statute that creates the classification must in fact reasonably and substantially further the legislative purpose. The determination of reasonableness must take into account the extent to which the constitutional right—in this case the right to sue for a full recovery under Article I, section 11—is diminished and the extent to which the burden imposed actually furthers the legislative goals, as well as the importance of those goals.

775 P.2d at 373 (citations omitted).

■ In sum and in elaboration of the above, we hold that a statutory classification that discriminates against a person's consti-

**15.** Justice Zimmerman's view with respect to the appropriate level of scrutiny under Article I, section 24 seems to be implicit in his view that legislative action trenching on Article I, section 11 rights must be given "careful scrutiny":

> Because the interests at stake are specifically protected by the constitution, the presumption of validity that normally attaches to legislative action must be reversed once it is shown that the enactment under scrutiny does, in fact, infringe upon the interests enumerated in article I, section 11. The burden then is upon the proponents of the legislation's validity to demonstrate that its restrictions on those rights are carefully drawn and supported by weighty considerations. And in weighing the proffers of the legislation's defenders, we should not use as our analytical model the permissive and perfunctory standard of reasonable relation ad-

vocated by the appellees and the dissenters. Instead, we should give the legislation and its justifications careful scrutiny to assure that redress of legally cognizable injuries is not unreasonably impaired.

*Condemarin,* 775 P.2d at 368 (citations omitted). See also *Mountain Fuel Supply Co. v. Salt Lake City Corp.,* 752 P.2d 884 (Utah 1988), an opinion authored by Justice Zimmerman that applied Article I, section 24 in a case that did not implicate Article I, section 11 rights. In that case, he pointed out that even the least restrictive standard of scrutiny, the rational-basis test, has, in some cases, been applied somewhat more strictly under Article I, section 24 than would have been applied under federal equal protection. *Id.* at 889–90.

**16.** Justice Durham applied this same standard under her state due process analysis.

tutionally protected right to a remedy for personal injury under Article I, section 11 is constitutional only if it (1) is reasonable, (2) has more than a speculative tendency to further the legislative objective and, in fact, actually and substantially furthers a valid legislative purpose, and (3) is reasonably necessary to further a legitimate legislative goal. *See Malan,* 693 P.2d at 670–71; *see also Condemarin,* 775 P.2d at 352 (Durham, J.); *Id.* at 373 (Stewart, J.); *Mountain Fuel Supply Co. v. Salt Lake City Corp.,* 752 P.2d 884, 890 (Utah 1988).

Our holding that the heightened-scrutiny standard governs the manner in which Article I, section 24 is applied when Article I, section 11 rights are implicated is supported by the rulings of other courts with respect to medical malpractice statutes and the effect of those statutes on the right to recover for negligently inflicted injuries. *E.g., Coburn v. Agustin,* 627 F.Supp. 983, 991–95 (D.Kan. 1985); *Kenyon v. Hammer,* 142 Ariz. 69, 688 P.2d 961, 975 (1984); *Farley v. Engelken,* 241 Kan. 663, 740 P.2d 1058, 1063–65 (1987); *Carson v. Maurer,* 120 N.H. 925, 424 A.2d 825, 830 (1980); *Arneson v. Olson,* 270 N.W.2d 125, 132–33 (N.D.1978); *Hoem v. State,* 756 P.2d 780, 784–85 (Wyo.1988) (Thomas, J., specially concurring) (concurring opinion constituted a plurality of the court with respect to this issue).

In addition, it is pertinent to note that the United States Supreme Court has applied a stricter standard of scrutiny in a number of federal equal protection cases involving the rights of children, although none involved a state medical malpractice act. *Plyler v. Doe,* 457 U.S. 202, 223–24, 102 S.Ct. 2382, 2398, 72 L.Ed.2d 786 (1982); *Lalli v. Lalli,* 439 U.S. 259, 268, 99 S.Ct. 518, 524, 58 L.Ed.2d 503 (1978); *Trimble v. Gordon,* 430 U.S. 762, 767, 97 S.Ct. 1459, 1463, 52 L.Ed.2d 31 (1977); *Weber v. Aetna Casualty & Sur. Co.,* 406 U.S. 164, 172, 176, 92 S.Ct. 1400, 1405, 1407, 31 L.Ed.2d 768 (1972); *see also Levy v. Louisiana,* 391 U.S. 68, 71, 88 S.Ct. 1509, 1511, 20 L.Ed.2d 436 (1968).

## III. WHETHER DISCRIMINATORY LIMITATIONS ON MALPRACTICE CLAIMS OF MINORS WILL REDUCE THE COST OF HEALTH CARE

Whether the Malpractice Act's discrimination against minors substantially and actually furthers the legislative purposes and objectives stated in § 78–14–2 and is reasonably necessary to achieve those ends is the issue we now address.[17]

During part of the 1970s and 1980s, medical malpractice insurance premiums across the country escalated significantly, and in some instances, dramatically. Those increases and their effects on the medical profession caused what is often referred to as the medical malpractice crisis. The cause of increased malpractice insurance premiums was widely attributed to significant increases in the number of malpractice lawsuits filed against physicians and hospitals and the size

17. Section 78–14–2 of the Malpractice Act states:

The legislature finds and declares that the number of suits and claims for damages and the amount of judgments and settlements arising from health care has increased greatly in recent years. Because of these increases the insurance industry has substantially increased the cost of medical malpractice insurance. The effect of increased insurance premiums and increased claims is increased care cost, both through the health care providers passing the cost of premiums to the patient and through the provider's practicing defensive medicine because he views a patient as a potential adversary in a lawsuit. Further, certain health care providers are discouraged from continuing to provide services because of the high cost and possible unavailability of malpractice insurance.

In view of these recent trends and with the intention of alleviating the adverse effects which these trends are producing in the public's health care system, it is necessary to protect the public interest by enacting measures designed to encourage private insurance companies to continue to provide health-related malpractice insurance while at the same time establishing a mechanism to ensure the availability of insurance in the event that it becomes unavailable from private companies.

In enacting this act, it is the purpose of the legislature to provide a reasonable time in which actions may be commenced against health care providers while limiting that time to a specific period for which professional liability insurance premiums can be reasonably and accurately calculated; and to provide other procedural changes to expedite early evaluation and settlement of claims.

of damages awards by juries. Although it was well-established that malpractice insurance premiums had substantially increased, the evidence for the asserted causes was largely anecdotal.

Initially, little effort was made to investigate empirically the real causes of the malpractice insurance crisis. The medical profession and the insurance industry blamed malpractice lawsuits, and as a result, "tort reform" legislation was enacted in a number of states. *See* Howard A. Learner, *Restrictive Medical Malpractice Compensation Schemes: A Constitutional "Quid Pro Quo" Analysis to Safeguard Individual Liberties,* 18 Harv.J. on Legis. 143, 148 (1981). The constitutionality of the legislation was at first sustained by courts on the unrebuttable presumption that a factual basis existed for the proposition that the malpractice crisis was caused by a large increase in the number of malpractice lawsuits filed and in the size of judgments against physicians and hospitals. *See id.* at 158–60 and cases cited therein. *But see Jones v. State Bd. of Medicine,* 97 Idaho 859, 555 P.2d 399, *cert. denied,* 431 U.S. 914, 97 S.Ct. 2173, 53 L.Ed.2d 223 (1976); *Wright v. Central Du Page Hosp. Ass'n,* 63 Ill.2d 313, 347 N.E.2d 736 (1976).

In time, however, the presumed causes of the "malpractice crisis" were challenged, as was the efficacy of the legislative responses. Robert B. McKay, *Rethinking the Tort Liability System: A Report From the ABA Action Commission,* 32 Vill.L.Rev. 1219, 1220 (1987); *see also Mominee v. Scherbarth,* 28 Ohio St.3d 270, 503 N.E.2d 717, 725–26 (1986) (Celebrezze, C.J., concurring). After assessing the factual basis for the so-called malpractice crisis and the legislative findings supporting tort reform legislation, a number of courts held that the crisis did not warrant restricting the rights of individuals injured by malpractice. *See Kenyon v. Hammer,* 142 Ariz. 69, 688 P.2d 961, 976–79 (1984); *Arneson v. Olson,* 270 N.W.2d 125, 136 (N.D. 1978); *Mominee v. Scherbarth,* 28 Ohio St.3d 270, 503 N.E.2d 717, 721 (1986); *Boucher v. Sayeed,* 459 A.2d 87 (R.I.1983).[18] In some cases, entire malpractice acts were held unconstitutional. *See, e.g., Carson v. Maurer,* 120 N.H. 925, 424 A.2d 825 (1980); *Arneson v. Olson,* 270 N.W.2d 125, 137–38 (N.D.1978). In addition, as Justice Durham stated in her opinion in *Condemarin,* 775 P.2d at 361–62, "[A] substantial majority of courts addressing damages limits in medical malpractice statutes have invalidated those limits, usually on equal protection grounds, but also occasionally under a due process rubric." *See, e.g., Coburn v. Agustin,* 627 F.Supp. 983, 997 (D.Kan.1985) (equal protection); *Waggoner v. Gibson,* 647 F.Supp. 1102, 1107 (N.D.Tex. 1986) (equal protection and due process); *Wright v. Central Du Page Hosp. Ass'n,* 63 Ill.2d 313, 347 N.E.2d 736, 743 (1976) (special legislation in violation of state constitution); *Kansas Malpractice Victims v. Bell,* 243 Kan. 333, 757 P.2d 251 (1988) (statute violated right to jury trial and right to remedy by due process of law); *Farley v. Engelken,* 241 Kan. 663, 740 P.2d 1058, 1068 (1987) (equal protection); *Carson v. Maurer,* 120 N.H. 925, 424 A.2d 825, 838 (1980) (equal protection); *Arneson v. Olson,* 270 N.W.2d 125, 136 (N.D. 1978) (equal protection); *Simon v. St. Elizabeth Medical Ctr.,* 355 N.E.2d 903, 906–07 (Ohio Ct. Common Pleas 1976) (equal protection); *Baptist Hosp. of Southeast Tex., Inc. v. Baber,* 672 S.W.2d 296, 298 (Tex.Ct.App. 1984) (equal protection); *cf. Smith v. Department of Ins.,* 507 So.2d 1080, 1088–89 (Fla. 1987) (due process and right to trial by jury); *Jones v. State Bd. of Medicine,* 97 Idaho 859, 555 P.2d 399, 416 (Idaho), *cert. denied,* 431 U.S. 914, 97 S.Ct. 2173, 53 L.Ed.2d 223 (1976) (remanding for factual determination on whether medical malpractice crisis actually existed); *Lucas v. United States,* 757 S.W.2d 687, 691–92 (Tex.1988) (due process); *Hoem v. State,* 756 P.2d 780, 784 (Wyo.1988) (equal protection). *But see Johnson v. St. Vincent Hosp., Inc.,* 273 Ind. 374, 404 N.E.2d 585 (1980) (upholding limitations under both due process and equal protection analyses).

When the Utah Health Care Malpractice Act was enacted, there was evidence before the Legislature that other states had experienced significant increases in the number of

---

**18.** These cases held unconstitutional various provisions in state medical malpractice acts, including limitations on minors' causes of action.

malpractice lawsuits and the size of verdicts. However, there was no evidence of increased malpractice lawsuits or of greater verdicts in Utah. In enacting the Malpractice Act, the Legislature relied on evidence contained in a 1976 report of the Utah Office of Legislative Research entitled *Medical Malpractice Insurance Problems* [hereinafter Report to the 41st Legislature or the Report]. We take judicial notice of the Report pursuant to Rule 201(b) of the Utah Rules of Evidence.[19]

The Report stated that in Utah, during the two and one-half years preceding the enactment of the Malpractice Act in 1976, only twelve malpractice lawsuits were tried or otherwise disposed of in the Third Judicial District of Utah.[20] *Report to the 41st Legislature*, at 21. Only one of those twelve cases involved a minor plaintiff, and only one resulted in a judgment for the plaintiff for $10,039.82. *Id.* at 21, 33–35. The Report also stated that from 1972 through 1974, the number of malpractice claims against the three largest medical malpractice insurance liability carriers in Utah had actually *decreased*. *Id.* at 10, 12. Although the Report concluded that malpractice insurance premiums had increased dramatically and that malpractice lawsuits and the size of malpractice verdicts had increased in some other states and nationwide, the Report did not indicate that increases in malpractice insurance premiums and the rising cost of medical care generally were attributable to medical malpractice lawsuits brought in Utah.

When the malpractice bill reached the floor of the Utah House of Representatives, Representative Franklyn B. Matheson made a motion on the floor of the House to strike the findings in the first paragraph of § 78–14–2 [21] that "the number of suits and claims for damages and the amount of judgments and settlements arising from health care has increased greatly in recent years [and because] of these increases the insurance industry has substantially increased the cost of medical malpractice insurance." Representative Matheson stated that based on the facts presented in the Report of the Office of Legislative Research, the statutory findings were not true with respect to Utah; in fact, he stated the evidence showed that there had been a *decrease* in medical malpractice claims in Utah. He made clear that whatever the case was in California and the nation as a whole, the Utah experience was different:

> Mr. Speaker, ... the language as it's presently stated reads "The Legislature finds" and this is a finding by this body, "and declares that the number of suits and claims for damages and the amount of judgments and settlements arising from health care has increased greatly in recent years." Now, Mr. Speaker, that may be the case on a national basis, but from the information that's been furnished to us from the interim committee study, that certainly is not the case or doesn't appear to be the case locally ... in the State of Utah, and I refer you to page 21 of the report in relation to court experience, and this would now be talking about suits, and the statement is made *"Through limited research it was found that high damage awards by courts are not common in Utah."* Then it goes on to say that from *January '73 to July 1975 only 12 suits were found in examining the records of the district courts and in only one of those cases ... was there a judgment in favor of the plaintiff.* Now, that does not sound to me as if there's been some type of an extreme problem in the State of Utah in relation to malpractice suits. *And then, again, as to claims, if you look at page 10 of the report, that's charts 4, 5 and 6, you see that, in fact, insofar as the three ...*

**19.** Judicial notice may be taken of facts pursuant to Rule 201(b) of the Utah Rules of Evidence when the facts are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Utah R.Evid. 201(b); *see also* Fed.R.Evid. 201(b). The Report to the 41st Legislature and the facts stated therein are "capable of accurate and ready determination." *Id.; see Atkins v. United States,* 214 Ct.Cl. 186, 556 F.2d 1028, 1041 (1977). Given the nature of the Report, we are of the view that its accuracy cannot reasonably be questioned. *Id.*

**20.** The Third Judicial District comprises all of Salt Lake County, the county with the largest population, the most doctors, and the most and largest hospitals in the state.

**21.** *See supra* note 17.

*primary companies writing this type of insurance in our state, Aetna Life, there's actually been a decrease in claims from '72 to '73, we don't have the figures for '74 and '75. The same thing with USF & G from '72 through '74, and the same thing with St. Paul Fire & Marine Insurance Company from '72 through '74. And so, in fact, it doesn't appear that the claims have been increasing, but in fact have been decreasing.* Now, there is obviously an increase in the severity of some of the claims and the amount of some of the claims, but I would suggest that may very well be related to the increase of medical costs and not a cause of increased medical costs. Now, finally, fellow legislators, . . . my argument is that this statement [in § 78–14–2] is apparently based upon nationwide experience. If you look on page three of your report, and this is a quote from Mr. Parker who is one of the members of the advisory committee that worked on this problem, he said *"Utah is being penalized as the result of being subject to national experience." Now, I just don't want any misunderstanding in the preamble of this Bill that the primary reason for this is because of increased claims and judgments in the State of Utah.* We could also list numerous other

things if we wanted to do so. In connection with what has been reported in the newspapers, and we've all seen the polls as to perhaps deterioration in somewhat of the doctor/patient relationship.

. . . .

. . . We discovered that when I sat on a medical malpractice advisory committee many years ago, . . . that the doctors were concerned about defensive medicine. But my suggestion to you and my case is that this is because of nationwide experience and not because of any local increase or suit-conscious, litigation-conscious concern. If you will look on page three in your report, it states very clearly, . . . "the causes of this problem, the two major causes" it indicates what they are[,] then it says "this is nationwide experience as reported by the American Medical Association." *I attended a medical malpractice conference in an adjoining state here on a legislative assignment, the representatives from all the western states except California, and the consensus seemed to be that we unfortunately are involved, in most of the western states, in paying the price for some bad experience in one particular state, the State of California.*[22]

22. We note that one study reported that the "crisis" in California referred to by Representative Matheson was precipitated by Argonaut Insurance Company:

> The present crisis was triggered in the fall of 1974, when the Argonaut Insurance Company announced to the doctors of northern California that they were seeking a 380 percent increase in premiums and ultimately intended to withdraw entirely from the field of medical malpractice insurance. Subsequently, other insurance companies announced proposed increases in premium rates and echoed the claim of the unprofitability in malpractice insurance. In the final analysis, it was Argonaut's abrupt increases coupled with the equally abrupt reaction by northern California physicians that led to the 1975 impasse over malpractice coverage. *Almost without questioning the validity of these rate increases, the medical profession lashed out at the legal profession, demanding radical changes in the existing compensatory system for medical malpractice.*

Wylie A. Aitken, *Medical Malpractice: The Alleged "Crisis" in Perspective*, 3 West.St.U.L.Rev. 27, 27–28 (1975) (emphasis added) [hereinafter

Aitken]. The consequence was a doctors' strike that placed many California hospitals near the brink of bankruptcy and led to that state's hastily enacted medical malpractice act. *Id.* at 28.

The questionable basis, at least to some extent, for the insurance premium increases is also suggested by Argonaut Insurance Company's premium increases in New York. On July 1, 1975, Argonaut threatened to cancel all its New York physicians' policies after it was denied a 196.8% rate increase in January 1975, even though it had been granted an earlier rate increase of 93.5% in July 1974. Note, *The Indiana Medical Malpractice Act: Legislative Surgery on Patient's Rights*, 10 Val.U.L.Rev. 303, 305 n. 1 (1976). The president of Argonaut asserted that the increase was necessary because Argonaut had lost $10 million in 1974 in medical malpractice costs. *Id.* at 304 n. 7. However, Argonaut had collected $15 million in premiums in 1974 and paid out only $250,000 in claims. Aitkin, at 35. . Argonaut also paid a $10,200,000 dividend to its parent company, conglomerate Teledyne Corporation, even though Argonaut had experienced a $90 million decrease in the value of its bond and stock portfolio. Note, *Indiana Medical Malpractice*, 10 Val.U.L.Rev. at 304 n. 7.

*Transcript of Discussion and Vote in Utah House of Representatives on H.B. 35* (Jan. 30, 1976) (emphasis added). Representative Matheson's motion to delete the legislative findings in § 78–14–2 was defeated, but no one disputed the correctness of his statements. Indeed, Representative Lorraine Johnson stated that "Utah is caught in the precarious position of subsidizing other states who have brought about a high malpractice case rate *whereas Utah has a low malpractice rate." Id.*

A study conducted by the National Association of Insurance Commissioners (NAIC) generally supports the findings in the Report to the 41st Legislature.[23] National Ass'n of Comm'rs, *Malpractice Claims, Final Compilation: Medical Malpractice Closed Claims, 1975–1978* (Sept. 1980) [hereinafter NAIC Report]. That study surveyed all medical malpractice *claims* (not lawsuits) on a nationwide basis from 1975 to 1978, roughly the same period of the alleged malpractice crisis that motivated passage of the Act. The study was funded by the insurance industry and was based on information from the malpractice case files of insurance carriers. The NAIC Report indicated that in Utah from 1975 to 1978, a total of 237 malpractice claims, or an average of 79 claims per year, were filed against Utah physicians. Only 84 of those claims, or an average of 28 per year, resulted in payments of any kind to claimants, and only four payments exceeded $100,-000. The total paid out on these claims was $1,813,452, an average of $21,589 per paid claim or an average of $7,652 per claim made, whether or not paid. *Id.* The number of minors' claims filed against insurance companies for malpractice in Utah was not significant. Only seventeen, 7.25 percent of total claims filed, were claims made for minors.

Of those claims, only nine were paid. The average time lapse between an injury to a minor and the filing of a claim was twelve months.[24] *Id.* at 115.

The Legislature's "findings" in § 78–14–2 wholly ignored the existence of any other causes for the dramatic increases in health care costs, even though the Utah medical profession itself has, since the enactment of the Malpractice Act, recognized that other causes had a much greater effect in increasing the costs of health care. In a document entitled *Medical Care Cost Containment Proposals* prepared by the Utah State Medical Association and adopted by its House of Delegates in March 1984, the causes of increased health care costs for 1974 through 1982 were identified as:

| | | |
|---|---|---|
| (a) | General inflation | 59% |
| (b) | Medical care inflation (over and above general inflation) | 11% |
| (c) | An increasing population | 8% |
| (d) | Other factors including modern medical care financing, the effect of governmental health programs, an increasing aging population, new technology, and the legal climate | 22% |

Thus, the dominant causes of increased health-care costs were factors other than increased malpractice insurance premiums. Although we do not know exactly to what extent malpractice lawsuits and insurance premiums contributed to increased health-care costs, we do know that they were a fraction of the 22% attributed to the other factors and an even smaller fraction of the total causes. Furthermore, there is evidence that notwithstanding the "tort reform" legislation enacted in the 1970s, malpractice premiums have continued to rise, while the ratio of physicians' malpractice insurance costs to physicians' incomes nationally has not changed significantly. Glen O. Robinson, *The Medical Malpractice Crisis of the 1970s:*

23. We also take judicial notice of the NAIC Report pursuant to Utah Rule of Evidence 201(b). *See supra* note 19.

24. After the Utah Malpractice Act was enacted, Utah experienced a realignment of insurance companies offering malpractice coverage. It is interesting to note that the experience in Utah continued to indicate that increases in insurance premiums were propelled largely by factors other than malpractice awards in Utah. By the end of 1983, the Utah Medical Insurance Association (UMIA), which is owned by Utah physicians and became Utah's primary malpractice carrier, paid

claims totaling $2.6 million during the first five years of its existence. For 1983, however, UMIA claimed $3.2 million in *unpaid* losses, nearly half its five-year total, thereby bringing its total of unpaid losses at the end of 1983 to approximately $8.3 million. During the same five-year period, UMIA collected over $13 million in premiums, or an average of $2.6 million per year. In addition, UMIA earned $4.3 million in investment income. UMIA Financial Statement for 1983; *Best's Insurance Reports for Property–Casualty Companies, 1983.*

*A Retrospective,* 49 Law & Contemp.Probs. 5, 31 (1986). The ratio has remained at about 1% of total health-care spending since 1976. *Mominee v. Scherbarth,* 28 Ohio St.3d 270, 503 N.E.2d 717, 725 (1986) (concurring opinion) (citing Stephen Zuckerman, Christopher F. Koller, & Randall R. Bovbjerg, *Information on Malpractice: A Review of Empirical Research on Major Policy Issues,* 49 Law & Contemp.Probs. 85 (1986)).

In sum, the dramatic increases in medical malpractice insurance premiums and the increased costs of health care were not caused by significant increases in malpractice lawsuits or claims in Utah, by either adults or minors, or by significant increases in the size of jury verdicts. The legislative means for solving the insurance problem by cutting off the malpractice claims of minors simply does not further the legislative objective. Therefore, applying the standard of scrutiny required under Article I, section 24 set out above, we hold that the nonuniform application of the limitations provisions in the Malpractice Act to minors' malpractice claims does not actually and substantially further the policy of curbing and reducing malpractice premiums and of ensuring reasonably priced health-care services to the people of Utah and is not necessary to accomplish those ends.

Furthermore, even if there were evidence of significantly increased malpractice lawsuits or increased jury verdicts in Utah, that would not be a legitimate basis for discriminating against the malpractice claims of minors.[25] And even if we were to assume that increased minors' malpractice claims increased malpractice insurance premiums and costs of health care to some extent, that would not justify shifting the costs of malpractice injuries from health-care providers to injured children and their caretakers. We agree with and adopt what the Supreme Court of Missouri stated in *Strahler v. St. Luke's Hospital,* 706 S.W.2d 7, 11 (Mo.1986):

> [W]e fully appreciate the legislative purpose intended by [the medical malpractice limitations statute], and we are unwilling to denominate it as being illegitimate, but we think the method employed by the legislature to battle any escalating economic and social costs connected with medical malpractice litigation exacts far too high a price from minor plaintiffs like Carol Strahler [the plaintiff in this case] and all other minors similarly situated. For minor plaintiffs like Carol Strahler, the cure selected by the legislature would prove no less pernicious than the disease it was intended to remedy.

Although it is not critical to our holding in this case, we note that there is respected authority for the proposition that a significant cause of dramatically increased malpractice insurance premiums was the cyclical pricing and investment practices of insurance companies. During certain periods, insurance companies set premiums at unrealistically low rates for the purpose of acquiring new business and increasing their revenues so that additional funds could be invested. Later, to offset the unrealistically low rates, higher rates were charged. Such cyclical pricing, which has little to do with malpractice claims and lawsuits, has been an important factor in the malpractice insurance premium crisis. Professor Robert B. McKay described insurance industry pricing practices and investment policies:

> In recent decades the property/casualty portions of the insurance industry have engaged in more or less violent cyclical

---

25. The Legislature also stated that one of the purposes for limiting the time in which actions may be commenced against health care providers was to allow insurers to reasonably and accurately calculate professional liability insurance premiums. Utah Code Ann. § 78–14–2. The evidence does not support the proposition that the "long tail" problem was a significant factor in causing high premiums in Utah. As noted in the NAIC Report, the average time lapse between an injury to a minor and the filing of a claim was only twelve months. NAIC Report, at 115. In addition, of the medical malpractice injuries that result in claims nationwide, 88% are reported within two years following the injury, and 97% are reported within four years. *Kenyon v. Hammer,* 142 Ariz. 69, 688 P.2d 961, 978 (1984) (citing U.S. Department of Health Education & Welfare, Pub. No. 73–88, *Medical Malpractice: Report of the Secretary's Comm'n on Medical Malpractice* 254 (1973)). The effect of the remaining 3% is comparatively minor, and to the extent that it affects insurance companies' costs, it is reasonably predictable. *Hayes v. Mercy Hosp. & Medical Ctr.,* 136 Ill.2d 450, 145 Ill.Dec. 894, 909, 557 N.E.2d 873, 888 (1990).

swings of boom and bust, profitability and loss. For example, in the medical malpractice "crisis" of the mid–1970s, the insurance companies were receiving low returns on their investments while payments for medical malpractice claims were increasing rapidly. Accordingly, and not surprisingly, the companies raised their rates dramatically, prompting startled protests from the health care services, particularly medical doctors. As a result of the complaints of the powerful medical profession, many states adopted legislation designed to reduce the recoveries and thus to influence a downturn in rates. Much of the legislation was ill-conceived, or at least did not perform as intended. But the "crisis" subsided, probably for two reasons. Most important was the fact that in the late 1970s and early 1980s interest rates began their dramatic climb, which permitted the insurance carriers to recoup their liability payouts with income from their investments of premium income. Accordingly, further rate increases became unnecessary, and even some reductions were possible. Secondarily, even where rates were not reduced to their former low levels, doctors adjusted to the higher rates as a cost of business that was comfortably passed on to their patients.

In the early 1980s, with interest rates at the highest level in memory, insurance companies prospered, and to some extent the favorable income statistics were passed on to customers in rates that did not reflect the cost of risk insurance, but were unrealistically low because of the hugely favorable investment climate.

This more or less euphoric state of affairs, momentarily favorable to insurers and insureds (however unfortunate for the economy as a whole) was not destined to last. As the economy more or less righted itself and interest rates declined to less than 10 percent, the property/casualty insurance industry began to suffer losses, sometimes severe, for two reasons. The artificially low rates that had been offered to attract premiums to be invested for high returns, now provided insufficient investment income to meet actuarially predictable losses.

. . . .

. . . What is difficult to determine is the extent to which the earlier rates were "too low" and the extent to which the increases pushed them "too high." Insurance companies have never been notably forthcoming with their official records or statements of profitability. However scanty the records, this much at least seems supportable: the insurance industry (especially the property/casualty branch) had some bad years between 1983 and 1985, but did much better, perhaps spectacularly so, from 1985 to 1987.

Robert B. McKay, *Rethinking the Tort Liability System: A Report From the ABA Action Commission,* 32 Vill.L.Rev. 1219, 1219–21, 1221 (1987) (citations omitted).

## IV. CONCLUSION

In conclusion, we hold § 78–14–4(2) unconstitutional under Article I, section 24 of the Utah Constitution. As a result, § 78–12–36 operates to toll both the two-year statute of limitations and the four-year statute of repose found in § 78–14–4(1) of the Malpractice Act.

By way of clarification, we add that we do not hold that the Legislature can never enact a statute of limitations that runs against minors' claims before the age of majority is reached. In this case, the right of a minor who is injured at birth is placed in particular jeopardy because the injury may not be detectable until after the limitations periods have expired. When a child is older, there is a greater probability that the existence and full extent of early injuries will become known. Even then, however, a minor has no legal capacity to sue, but if procedures were adopted that assured that a minor's legal claim could be litigated notwithstanding the neglect, abandonment, or indifference of parents or caretakers, a statute of limitations applicable to minors' claims might then be more procedural than substantive and could possibly constitutionally bar a minor's claim filed after the statute of limitations had run.

Most parents do, of course, act in a vigilant manner with respect to their children's claims. Indeed, parents often have a mone-

tary self-interest in asserting a legal claim for a child. Nevertheless, the law must guard the rights of children, many of whom, unfortunately, live in families where attention to a child's needs may be wanting. As we recognized in *Scott v. School Board*, 568 P.2d 746 (Utah 1977), the possibility that a child's rights may be lost through a parent's or another caregiver's neglect, indifference, or abandonment is too great for the law to ignore.

We are, of course, aware that the affairs of life must go on and that resolution of disputes cannot always wait until children grow up. Estates must be settled, property titles must be cleared to maintain the alienability of property,[26] and other affairs must be concluded so that life's affairs are not frozen until a minor reaches majority. To serve those ends and to protect minors' rights, the law must provide minors with a reasonable opportunity to have their legal claims adjudicated. Perhaps the Legislature can provide a means that adequately protects the claims of minors short of keeping all such claims

viable until minors reach the age of majority.[27]

The judgments in both cases are reversed and remanded for further proceedings.

HOWE, A.C.J., and DURHAM, J., concur.

ZIMMERMAN, Justice, concurring in the result:

I join in the result reached by the majority opinion. However, I do not base my decision on the uniform operation of laws provision in article I, section 24 of the Utah Constitution as does the majority, but on article I, section 11, the open courts provision. Both grounds were argued by the parties, but here, as in *Condemarin v. University Hospital*, 775 P.2d 348, 366 (Utah 1989) (Zimmerman, J., concurring in part), I find no reason to reach the uniform operation of laws provision when the right at issue is plainly one protected by article I, section 11. In this respect, I adhere to my position in *Condemarin* and employ the substantive due process analysis of *Berry v. Beech Aircraft Corp.*, 717 P.2d 670, 677 (Utah 1985), that is appropriate to article I, section 11 claims.[1]

26. Section 78–12–36, which tolls limitations periods for minors generally, specifically excludes actions "for the recovery of real property." That exception is justified by the necessity of maintaining the alienability of property.

27. Utah's medical malpractice limitations scheme is unusually harsh in applying statutes of limitations to all minors, including newborn infants injured in their earliest days. As far as we have been able to determine, only Oregon and Utah have statutes that bar all tolling of minors' claims. *See Jones v. Salem Hosp.*, 93 Or.App. 252, 762 P.2d 303 (1988). Every other state that has addressed this issue has dealt with statutes that have allowed limited tolling of minors' claims for at least part of the period of minority. *See Reese v. Rankin Fite Memorial Hosp.*, 403 So.2d 158, 160 (Ala.1981) (minors under four have until age eight to commence action); *Barrio v. San Miguel Div. Hosp. for Magna Copper Co.*, 143 Ariz. 101, 104, 692 P.2d 280, 283 (1984) (en banc) (child under seven has until age ten to commence action); *Young v. Haines*, 41 Cal.3d 883, 226 Cal.Rptr. 547, 549 n. 2, 718 P.2d 909, 911 n. 2 (1986) (minors under six have until age eight to bring claim); *Cole v. Delaware League for Planned Parenthood, Inc.*, 530 A.2d 1119, 1122 n. 2 (Del.1987) (minor under six has until age six to bring claim or until two-year statute of limitations/three-year statute of repose expires, whichever is longer); *Rohrabaugh v. Wagoner*, 274 Ind. 661, 413 N.E.2d 891, 892 (1980) (minors under

six have until age eight to commence action); *Wheeler v. Lenski*, 8 Kan.App.2d 408, 658 P.2d 1056, 1058 (1983) (minor has eight years from time of act giving rise to cause of action to bring claim); *Cioffi v. Guenther*, 374 Mass. 1, 370 N.E.2d 1003, 1005 n. 1 (Mass.1977) (minor under six has until age nine to commence action); *Strahler v. St. Luke's Hosp.*, 706 S.W.2d 7, 8 (Mo.1986) (en banc) (minor under ten has until age twelve to bring action); *Carson v. Maurer*, 120 N.H. 925, 424 A.2d 825, 833 (1980) (minors under age eight have until age ten to bring action); *Hohn v. Slate*, 48 N.C.App. 624, 269 S.E.2d 307, 307 (1980) (minor has until age nineteen to commence action); *Mominee v. Scherbarth*, 28 Ohio St.3d 270, 503 N.E.2d 717, 718 (Ohio 1986) (minor under age ten has until age fourteen to bring claim); *Lyons v. Lederle Laboratories*, 440 N.W.2d 769, 770 (S.D.1989) (minors under six have until age eight to commence action); *Sax v. Votteler*, 648 S.W.2d 661, 663 (Tex.1983) (minors under six have until age eight to commence action). These statutes provide a more realistic opportunity for infants to have their rights protected than does § 78–14–4.

1. Justice Stewart relies on the fact that the statute challenged infringes on a right guaranteed by article I, section 11 as justification for invoking a standard of scrutiny higher than that applicable under article I, section 24 when mere economic legislation is at issue. *See, e.g., Blue Cross & Blue Shield v. State*, 779 P.2d 634, 637–38 (Utah

As to the basis of my decision today, the legislature has effectively enacted a statute of repose for minors in medical malpractice cases. As the majority points out, the statutes at issue here require a minor to bring an action within two, or at a maximum, four, years after the malpractice injury. But since a minor has no legal, and ordinarily no actual, ability to bring an action, even though he or she owns the cause of action, the net effect of the statute is to deprive the minor of the cause of action before the minor is legally entitled to assert it. *Cf. Scott v. School Bd. of Granite Sch. Dist.*, 568 P.2d 746 (Utah 1977).

Because the legislation at issue operates as a statute of repose for minors and drastically limits a minor's right to a substantive "remedy by due course of law" for "an injury done to him [or her] in his [or her] person, property or reputation," Utah Const. art. I, § 11, the legislation's constitutionality must be tested under the settled open courts standards of *Berry* and its progeny. *See, e.g., Horton v. Goldminer's Daughter*, 785 P.2d 1087 (Utah 1989); *Sun Valley Water Beds v. Hughes & Son*, 782 P.2d 188 (Utah 1989). Those standards are as follows:

> First, section 11 is satisfied if the law [limiting one's right to remedy] provides an injured person an effective and reasonable alternative remedy "by due course of law" for vindication of his [or her] constitutional interest. The benefit provided by the substitute must be substantially equal in value or other benefit to the remedy abrogated in providing essentially comparable substantive protection to one's person, property, or reputation, although the form of the substitute remedy may be different.
>
> Second, if there is no substitute or alternative remedy provided, abrogation of the remedy or cause of action may be justified only if there is a clear social or economic

evil to be eliminated and the elimination of an existing legal remedy is not an arbitrary or unreasonable means for achieving the objective.

*Berry*, 717 P.2d at 680 (citations omitted), *quoted in Sun Valley Water Beds*, 782 P.2d at 191–92.

It should be added that under our article I, section 11 cases, when we have found a statute to limit a right protected by the open courts provision, we have, *de facto*, shifted from a presumption that the limiting statute is constitutional to a presumption that the statute is unconstitutional, placing the burden to show that the *Berry* test is satisfied upon those seeking to uphold the challenged statute. This shift of presumption can be seen from a careful reading of *Berry*, *Sun Valley Water Beds*, and *Horton*, cases from which no member of the present court dissented, and in Justice Durham's and my open courts analysis in *Condemarin*. I suggested in *Condemarin* that this shift of presumption be stated openly, 775 P.2d at 368 (Zimmerman, J., concurring in part); *accord Horton*, 785 P.2d at 1096 (Zimmerman, J., concurring, joined by Durham, J.), and I repeat that suggestion again today.

In the instant case, a straightforward article I, section 11 analysis leads easily to the conclusion that this statute, like those addressed in *Berry*, *Sun Valley Water Beds*, and *Horton*, is unconstitutional. First, the statutes in question provide no real alternative remedy to the right of the minor to sue after majority, which was the common law antedating statehood. The statutes' defenders contend that an adequate substantive remedy is provided by the fact that a minor's parent can be appointed guardian ad litem and that a parent has a natural interest in seeing that the child's legal rights are vindicated. As an initial matter, the statutes at issue provide no alternative or substitute remedy for the one taken away. But even if

1989); *Mountain Fuel Supply Co. v. Salt Lake City Corp.*, 752 P.2d 884, 888 (Utah 1988). On the other hand, under the majority opinion, if the interest at stake is one that does *not* fall within the protection of article I, section 11, a lower level of scrutiny is appropriate. However, I suspect that as applied by the majority, the real analytical importance of the stated level of scruti-

ny is less than meets the eye, at least where legislation impinging on recovery for personal injuries is at issue. *See McCorvey v. Utah*, 868 P.2d 41 (1993) (Stewart, J., concurring and dissenting, joined by Durham, J.) (arguing that damage cap on personal injury recoveries against state cannot pass scrutiny under lower standard of scrutiny for economic legislation).

the existence of a *de facto* alternative or substitute would satisfy the requirements of article I, section 11, the facts of the two cases before us are profound proof that the asserted *de facto* substitute of relying on a parent to protect the minor's interest is not "essentially comparable substantive protection" for the child's ability to bring his or her own action after obtaining majority.

Moving to the second analytical element of *Berry,* in the absence of an adequate substitute or alternative remedy, the proponents of the legislation limiting article I, section 11 rights must show that "there is a clear social or economic evil to be eliminated and [that] the elimination of an existing legal remedy is not an arbitrary or unreasonable means for achieving the objective." 717 P.2d at 680. Here, as in the analogous situation in *Condemarin,* the legislation's supporters have not carried their burden of proof. As the majority opinion demonstrates, the justifications advanced for the legislature's severe abridgement of the right of this narrow category of potential plaintiffs to bring their actions for actual injuries suffered are speculative, to put it charitably. The defenders of this legislation certainly have not shown that the effective elimination of the minor's legal right to sue for medical malpractice is a reasonable, nonarbitrary means for lowering medical malpractice premiums in Utah. Absent such a showing, they have failed to rebut the presumption of unconstitutionality that attaches to legislation that so severely limits a common law right of action protected by article I, section 11.

For the foregoing reasons, I concur in the decision of the majority to strike down section 78–14–4(2) to the extent that it applies to minors.

HALL, C.J., concurs in the concurring opinion of ZIMMERMAN, J.